932 F.2d 218
 30 Wage & Hour Cas. (BN 455, 1991 A.M.C.
2017, 59 USLW 2687,
118 Lab.Cas. P 35,475
 Ernesto C. CRUZ, Victorino A. Domingo, Zaldy N. Bantilian,
Leonardo J. Espiritu, Wilfredo D. Jequinto, Juan S.
Terencio, Severiano S. Gasataya, Jr., Roberto A. Alejado,
Vicente B. Solano, Cesar B. Del Rosario, Renato M. Santiago,
Erlito R. Vistar, Richard B. Celoso, Cirilo R. Pacheco,
Antonio T. Tanio-An, Armando C. Erediano, Pascualito R.
Amistoso, Romeo D. Bardalo, Jose C. Concha, Miguel A. Gomez,
Jr., Romeo B. Enriquez, Jaime M. Inovejas, Moreno T. Jesus,
Raymundo B. Arvesu, Faustino T. Piedad, Jr., Renato O.
Canafranca, Ricardo D. Bobis, Angel L. Bonotan, Antonio V.
Soriano, Celso A. Torno, Benjamin G. Punzalan, Rufino M.
Castillo, George P. Alarcon, Wilfredo G. Pasoquin, Beato V.
Bautista, Fernando O. Legarejos, Jennifer M. Ofelas, Alfred
L. Bricia, Eliodoro C. Alojado, Felicisimo D. Abubo,
Wilfredo T. Dela Pena, Romeo A. Alimodo, Jr., Fernando D.
Mabutas, Isabelito J. Borja, Magpuri H. Ramos, Jr., Rodolfo
A. Francisco, Manolito R. Galang, Gloreto A. Aquino, Mervin
Villanueva, Dandy D. Cabalo, Ronilo J. Perez, Rodito G.
Nacional, Juan C. Isles, Arturo M. Lontajo, Romeo D.
Dimalanta, Daniel J. Maceda, Ronald P. Gamo, Jacob Quirante
II, Robert C. Alamar, Vincente Silan, Antonio O. Montemayor,
Zosimo E. Duque, Eliserio Parohinog, Alex P. Oblefias,
Arthur A. Navarro, Maximilliano S. Paraiso, Alexander A. San
Gabriel, Mario Lee V. Imbong, Rene D. Ayukil, Rosseler B.
Vergara, Edgar B. Villarante, Jimmy G. Haresco, Godofredo C.
Oliver, Jr., Danilo R. Roco, Pedro Tiongzon, Ruben A.
Datingaling, Teodoro S. Bernal, Victorio L. Aguilar, Mario
S. Manosca, Eduardo F. De Los Santos, Jaime N. Macativo,
Jr., Erwin L. Oyao, Melquiades L. Galloso, Jr., Efren B.
Gavino, Tirso R. Racza, Jr., Jose M. Sagana, Modesto T.
Banogon, Teddy C. Tefora, Henrito S. Alonsagay, Luis J.
Ortiz, Rogelio R. Ortiz, Carlito Maprangala, Charlie T.
Sansaet, Ernesto B. Javier, Reynaldo A. Cabacungan, Manuel
D. Olivo, Illuminado M. Patal, Rafael D. Perez, Onofre S.
Rodriguez, Jr., Jorge P. Dela Cruz, Martin F. Cruz, Jr.,
Salvador Balane, Rogelio Cerezo, Sr., Roger J. Dalumpines,
Francisco P. Suelo, Reynaldo G. Cadaoas, Marcelo T. Bee,
Jorge Y. Villarojo, Nerlito L. De Jesus, Noel A. Deloso,
Marion Calderon, Jr., Floro M. Bautista, Jr., Rufino
Capitle, Emilio A. Fernandez, Ricardo G. Antonio, Edward A.
Marty, Amador C. Isles, Severo Acupan, Gemson C. Boongaling,
Danilo Agaza Antonio, Jose Casiguran Gulliab, Jr., Carlos
Padernal Villanueva, Jose Lim Abutin, Roberto Beley Andaya,
Pedro B. Nunez, Sabino Ninel Martinez, Danilo D. Javier,
Alejandro Sosa Ortega, Ricardo S. Guartilla, Romeo L. Molar,
Anastacio B. Magsino, Efraim Suarez, Melchor Pineda, R.C.
Cerezo, Sr., Maximo P. Pineda, Antonio G. Gemoto, Rizal O.
Salem, Edison Mamburam, Jerson R. Dela Cerna, Junio P.
Dequito, Pacifico B. Catu, Rudolfo I. Tiana, Carlito A.
Bano, Reynaldo M. Custodio, Reynaldo R. Bautista, Modesto
Graciosa, Fernando I. Alivia, Lauro A. Buenaflor, Elmo M.
Lalic, Claudio C. Varzuelo, Maximo G. Tapalla, Jr.,
Benvienida Bornasal, Merito A. Dialino, Alex O. Fortunado,
Geraldine V. Nicolas, Herculano R. Gallentes, Geronimo V.
Francisco, Gerardo L. Roa, George I. Lopez, Divina R. Saa,
Amelia T. Cordova, Wilfredo P. Bangcuyo, Andelino T. Marzan,
Danilo E. Delaluna, Ireneo R. Sarno, Rodolfo T. Dacquel,
Elmer P. Unica, Antonio M. Delos Santos, Danilo T.
Bonitollo, William Calip, Jr., Guerrero M. Opao, Eduardo D.
Jardin, Gibson P. Roberto, Jr., Vincente E. Flores, Napoleon
Arroyo, Mario Fermin, Fulgencio B. Cerdena, Ronaldo C.
Olarte, Abner C. Rodriquez, Danilo R. Albayda, Jesus Bayani
G. Torres, Sergio N. Saludo, Reynaldo Ilao, Gerardo M. Dela
Cruz, Amador C. Villacin, Nicanor W. Arancon, Jr., Luisito
R. Salazar, Eduardo A. Narciso, Marcelo Eugenio, Nestor De
Jesus, Manuel B. Lim, Kenneth V. Jallorina, Salvador A.
Balagtas, Rodito L. Rubion, Ernesto Manalansan, Carlo A.
Encarnacion, Domingo B. Bacabac, Mario M. Castillo, Severino
Z. Samson, Rodrigo L. Murillo, Noel A. Papango, Oscar P.
Villanueva, Roger T. Del Rosario, Vicente Marinas, Samuel C.
Atienza, Teofilo Arellano, Carlie D. Alvarez, Alfredo M.
Talub, Ramon M. Henson, Leopoldo Mercolita, Ramon P.
Tolentino, Genaro M. Anciano, Diodoro B. Dalaguan, Danilo B.
Estrosos, Anthony G. Apostol, Alfredo S. Corcino, Jesus
Portugal, Jr., Aser S. Salac, Sr., Robert S. Gevero, Macario
L. Abion, Calixto S. Apit, George Cabaluna, Sergio T.
Calimbas, Sergio T. Calumbas, Jose T. Inton, Alfredo Lucas,
Carlos C. Ramirez, Roland L. Ventura, Appellants,
v.
CHESAPEAKE SHIPPING INC.; Gleneagle Ship Management Co.,
Inc.; Kuwait Oil Tanker Company; Kuwait Petroleum
Corporation; KPC (U.S. Holdings) Inc.; Santa Fe
International Corp.; Naess Shipping (Holland) B.V. of Amsterdam.
 No. 90-3390.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 7, 1991.
Decided April 29, 1991.
 
 Joseph E. Mayer (argued) and Stephen M. Koslow, Quasha Wessely & Schneider, Washington, D.C., for appellants.
 T.S.L. Perlman (argued) and Eugene P. Miler, Fort & Schlefer, Washington, D.C., for Chesapeake Shipping, Inc., Gleneagle Ship Management Co., Inc., and Kuwait Oil Tanker Co. S.A.K.
 Michael M. Johnson (argued), Baker & Hostetler, McCutchen Black, Los Angeles, Cal. and Michael B. McCauley, Palmer, Biezup & Henderson, Wilmington, Del., for Kuwait Petroleum Corp. and Santa Fe Intern. Corp.
 Before COWEN, ALITO, and ROSENN, Circuit Judges.
 OPINION ANNOUNCING THE JUDGMENT OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal, arising in the context of the unanticipated juxtaposition of foreign policy decisions with domestic regulation of employee working conditions, presents the novel question of whether the temporary reflagging of former Kuwaiti oil tankers under the United States flag renders the Fair Labor Standards Act, 29 U.S.C. Sec. 201, et seq. ("FLSA" or "the Act"), applicable to foreign seamen employed on ships operating entirely outside the United States. In 1987, as a result of the hazards the Iran-Iraq war posed to neutral shipping operations in the Persian Gulf, eleven Kuwaiti vessels were reflagged to gain the protection of the United States. The plaintiffs, 228 Philippine seamen employed on these vessels, claim that the reflagging, which required compliance with extensive United States maritime statutes, entitled them to minimum wages and benefits under FLSA.[1]
 
 
 2
 The United States District Court for the District of Delaware granted defendants' motion for summary judgment, holding that under choice of law principles, United States law did not apply to these seamen, or alternatively, that these seamen were not engaged "in commerce" as required by FLSA and that the vessels came under the foreign territory exemption of FLSA. Plaintiffs appealed. We affirm the judgment of the district court because Judge Cowen believes that under choice of law principles United States law did not apply to the plaintiffs and I believe that the plaintiffs were not engaged in commerce nor employed by an enterprise engaged in commerce under the terms of FLSA.
 
 I.
 A. Reflagging Requirements
 
 3
 By 1986, the Iran-Iraq war, which began in 1980, was threatening to disrupt neutral shipping operations in the Persian Gulf. Ironically, in light of the recent Iraqi invasion of Kuwait, Kuwait's assistance to Iraq in its war with Iran placed their shipping operations particularly at risk. The Iranian Government had intensified its efforts to intimidate Kuwait in an attempt to prevent Kuwait from supporting Iraq through financial assistance and use of its ports.
 
 
 4
 To gain the protection of the United States Navy while transporting oil and oil products in and from the Persian Gulf, Kuwait approached the United States and proposed that eleven Kuwaiti tankers be reflagged under the United States flag. The President, after consulting with the Secretary of Defense, the Secretary of State, and the National Security Advisor, granted Kuwait's request. Kuwaiti Tankers: Hearings before the House Committee on Merchant Marine and Fisheries, 100th Cong., 1st Sess., 40 (1987) (hereinafter Hearings).
 
 
 5
 Three issues arose with regard to the reflagging: compliance with United States maritime laws requiring American ownership, adherence to safety regulations, and fulfillment of manning requirements. Congress required that American-flag vessels be owned by an entity such as
 
 
 6
 a corporation established under the laws of the United States or of a State, whose president or other chief executive officer and chairman of its board of directors are citizens of the United States and no more of its directors are noncitizens than a minority of the number necessary to constitute a quorum....
 
 
 7
 46 U.S.C. Sec. 12102. Upon reflagging, the law required that ownership of the vessels be transferred to a United States entity. The defendant, Chesapeake Shipping Inc., was chartered on May 15, 1987, under the laws of Delaware for the specific purpose of satisfying this statutory requirement.
 
 
 8
 United States maritime laws also required that the reflagged tankers be brought into compliance with marine safety laws and regulations. The Coast Guard granted a one-year grace period to comply with Coast Guard safety regulations and a two-year grace period to meet dry-docking requirements.
 
 
 9
 Finally, 46 U.S.C. Sec. 8103 compelled that the reflagged vessels satisfy certain manning requirements. Section 8103 required that the ship's master and radio officers be United States citizens. Presently, section 8103(b)(1) also requires that each unlicensed seaman be a United States citizen or an alien lawfully admitted to the United States for permanent residence with a limitation of twenty-five percent placed on the number of aliens. However, at the time the Kuwaiti tankers were reflagged, section 8103(b) permitted "the use of non-United States citizen crew members while each vessel is engaged on a foreign voyage and does not call at a United States port."[2]
 
 
 10
 Pursuant to this foreign-to-foreign port exception to the manning requirements and the agreement between Kuwait and the United States that the reflagged tankers would not call at United States ports, the vessels were permitted to retain their crew of unlicensed seamen recruited in the Philippines and could replace those seamen with other foreign nationals. These Philippine crewmen are the plaintiff-appellants in this action who claim that they are entitled to the minimum wages and benefits provided by FLSA.
 
 B. The Plaintiffs
 
 11
 Plaintiffs consist of 228 Philippine seamen who were crewmembers of the eleven Kuwaiti tankers during the time that the vessels were reflagged under the United States flag. All 228 are Philippine citizens and residents. They came from the Philippines to the Persian Gulf, signed on vessels there, and served tours of duty of several months. Upon completion of their tours of duty, the seamen were flown back to the Philippines. None have ever entered the United States.
 
 
 12
 The seamen were hired through the efforts of Naess Shipping B.V. of Amsterdam ("Naess").[3] Naess, a crewing contractor, is a Netherlands corporation. The Philippine government required Naess to negotiate with the Philippine Overseas Employment Administration ("POEA"), an agency of the Philippines Ministry of Labor and Employment, in hiring the Philippine seamen. Under Philippine law, no foreign employer may hire Philippine workers for overseas employment except through the POEA.
 
 
 13
 The Philippine government established the POEA to promote and develop overseas employment opportunities and to afford protection to Philippine workers and their families. The POEA has promulgated extensive rules and regulations controlling overseas employment to accomplish these objectives. It registers seamen seeking jobs, prescribes standard employment contracts for them, approves their wages, and requires that 80% of their earnings be sent home. The POEA regulates advertisement and placement, contract processing and travel documentation, the filing of grievances, and provides worker assistance and welfare services.
 
 
 14
 Naess and the Associated Marine Officers & Seamen's Union of the Pacific, a Philippine labor union, negotiated the plaintiffs' wages. The POEA verified and approved the individual contracts. The contracts also required the POEA's prior approval of any alterations or changes in the contract and that all rights and obligations of the parties to the contract would be governed by the laws of the Republic of the Philippines, international conventions, treaties and covenants wherein the Philippines is a signatory. The labor contract for these Philippine seamen granted POEA "original and exclusive jurisdiction over any and all disputes or controversies arising out of" the contract and that all claims would be exclusively resolved through the established grievance procedure, the POEA, and the Philippine Court of Justice, in that order.
 
 C. The Defendants
 
 15
 The defendants consist of a number of corporations involved in the ownership and management of the eleven vessels. Three American corporations were named as defendants: Chesapeake Shipping Inc. ("Chesapeake"); Gleneagle Ship Management Company, Inc. ("Gleneagle"); and Santa Fe International Corporation ("Santa Fe"). Two Kuwaiti corporations are also defendants: Kuwait Oil Tanker Company ("KOTC") and Kuwait Petroleum Corporation ("KPC"). (See appendix A for Organizational Chart).
 
 
 16
 KPC, a corporation which is wholly owned by the Kuwaiti Government, is at the apex of the corporate structure. It wholly owns both KOTC and Santa Fe.[4] KOTC, in turn, wholly owns Chesapeake. Gleneagle is a completely independent corporation.
 
 
 17
 Prior to the reflagging, KOTC owned the eleven vessels. As stated above, KOTC, to satisfy the United States ownership requirement, created Chesapeake as its wholly owned subsidiary. In consideration for all of Chesapeake's stock, KOTC transferred title to the eleven vessels to Chesapeake. Upon transfer of the title of the eleven tankers to Chesapeake, Chesapeake immediately time-chartered them back to KOTC. KOTC, in turn, time-chartered at least one of the tankers to KPC.
 
 
 18
 Chesapeake also chartered an American flagged and crewed vessel named the Ocean Wizard (later replaced by the Ocean Runner) from Belmont VLCC, Inc. for the transport of petroleum and petroleum products in the Persian Gulf. By chartering these vessels, Chesapeake insured that even if American "legislative problems" forced it to deflag its eleven tankers, it would "retain U.S. naval presence with the 'Ocean Wizard' on the basis of that vessel being on a shuttle between Kuwait and Khor Fakkan." This vessel engaged in the same trading patterns as the eleven reflagged vessels.
 
 
 19
 As required by law, a majority of Chesapeake's officers and directors were United States citizens. Most of Chesapeake's officers and directors were also officers of defendant Santa Fe, the Delaware corporation acquired by KPC in 1983. The rest of Chesapeake's officers and directors were also officers and directors of KOTC.
 
 
 20
 Santa Fe entered into a management service agreement with Chesapeake, under which Santa Fe contracted to perform administrative, accounting, and professional services for Chesapeake. Santa Fe also prepared Chesapeake's United States tax returns and oversaw the vessels' compliance with our maritime laws.
 
 
 21
 KOTC also entered into a management services agreement with Chesapeake. Pursuant to the agreement, KOTC undertook to provide certain "principal services" including legal services regarding observation of United States laws, e.g., maritime, corporate and labor, for which it, like Santa Fe, would receive a $6,000 monthly fee and reimbursement of expenses.
 
 
 22
 Gleneagle, another Delaware, but wholly independent, corporation, also contracted with Chesapeake to manage the reflagged vessels. It is the American affiliate of a worldwide vessel management group and has the approval of the Maritime Administration of the United States Coast Guard to manage any American-flag vessel. Gleneagle assumed the responsibility of providing the required American masters and radio officers and arranged for their hire, transportation, and payment. The management agreement also delegated other responsibilities to Gleneagle, such as providing supplies, fuel, victuals, repairs, customs entry and exit clearances, insurance, and crew members, but by a co-terminous sub-management agreement, Gleneagle re-delegated these functions to KOTC. KOTC continued to recruit Philippine seamen through the same manning agents it had previously used, including principally Naess.
 
 
 23
 To facilitate the duties assumed by KOTC directly from Chesapeake and indirectly from its sub-management agreement with Gleneagle, KOTC set up a "field office" in Paramus, New Jersey. KOTC rented this space from A.B.S. Worldwide Technical Services ("Abstech"). In connection with the mandated safety and docking modifications, between January 1988 and 1989, KOTC purchased $3,907,356 in supplies and equipment from United States suppliers which were delivered to points outside the United States. KOTC charged Chesapeake for all the expenses it incurred from these activities.
 
 D. The Shipping Operations
 
 24
 Following their reflagging, the eleven vessels continued to operate uninterruptedly in their former shipping routes under the protection of a United States Navy escort in the carriage of petroleum and its products between the Persian Gulf and Europe, the Mediterranean and the Far East. The vessels maintained telecommunications with Santa Fe in California and Gleneagle in Texas through a satellite communication system administered by Inmarsat and its American company, Comsat. Chesapeake paid for these services.
 
 
 25
 None of the reflagged vessels ever called at a United States port pursuant to the Kuwait-United States agreement. Because these vessels were granted temporary waivers from drydocking and safety requirements, the condition of no American port call was imposed to avoid "skew[ing]" or "having an adverse impact on the marketplace." Hearings at 87-88. However, during August of 1989, $2,811,444 of cargo from one of the vessels was transhipped to American oil companies in the United States.
 
 
 26
 In the spring of 1989, KOTC repurchased six of the reflagged vessels and documented them as Kuwaiti vessels. The foreign crews of the five vessels that retained their United States registry were replaced with American seamen in all licensed and unlicensed positions.
 
 II.
 
 27
 The district court granted defendants' motion for summary judgment based on three grounds. First, the court held that under a choice of laws analysis, American law did not apply and the plaintiffs had alleged only a violation of American law. Second, the court held that FLSA did not apply to these seamen because they were not engaged in commerce, nor did the defendants constitute an enterprise engaged in commerce. Finally, the court held that the Philippine seamen were not entitled to the protection because they came under the foreign workplace exception found in section 213(f) of FLSA.
 
 
 28
 Under Fed.R.Civ.P. 56, summary judgment can be granted only if is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The facts must be viewed in the light most favorable to the party opposing the motion. Bechtel v. Robinson, 886 F.2d 644, 647 (3rd Cir.1989). This court is required to apply the same test the district court should have used initially. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3rd Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In the present case, the facts are undisputed. Our review of the legal question of whether the plaintiffs are entitled to recover under FLSA is plenary.
 
 A. Applicable Law
 
 29
 Before turning to the statutory interpretation of FLSA, the threshold question of whether FLSA is at all applicable to the situation at hand must be answered. The district court held that under choice of law principles, American law did not govern the dispute and that because the plaintiffs had alleged only a violation of American law, summary judgment should be granted for the defendants.
 
 
 30
 The district court employed a choice of law analysis using the principles established in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970). In Lauritzen and Hellenic, the Supreme Court considered the applicability of the Jones Act, 46 U.S.C. Sec. 688, which at that time provided that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law...." The Court noted that if the Jones Act were read literally, Congress had "extended our law and opened our courts to all alien seafaring men injured anywhere in the world in service of watercraft of every foreign nation." Lauritzen, 345 U.S. at 577, 73 S.Ct. at 925.
 
 
 31
 Such all-encompassing language, the Court noted, presented a problem of statutory interpretation of deciding whether the Congress intended the Jones Act to be applied to foreign events or transactions. The Court concluded that:
 
 
 32
 Congress could not have been unaware of the necessity of construction imposed upon courts by such generality of language and was well warned that in the absence of more definite directions than are contained in the Jones Act it would be applied by the courts to foreign events, foreign ships and foreign seamen only in accordance with the usual doctrine and practices of maritime law.
 
 
 33
 Lauritzen, 345 U.S. at 581, 73 S.Ct. at 927. Thus, the Jones Act did not provide any limitation as to its application, thereby necessitating the use of choice of law principles governing maritime tort claims.
 
 
 34
 Congress, in enacting FLSA, explicitly considered the reach of the Act. Unlike the Jones Act, whose literal interpretation would apply to seamen injured everywhere in the world, Congress has limited the applicability of FLSA to seamen and other employees by imposing certain requirements. To be covered by FLSA, seamen must meet a two-part requirement. First, the seamen must be engaged "in commerce" or employed by an "enterprise engaged in commerce." See 29 U.S.C. Sec. 206(a). Second, the seamen must be employed on an American vessel. See 29 U.S.C. Sec. 213(a)(14). If the plaintiffs in the present case meet FLSA's two prong requirement and no statutory exemption applies, then they are entitled to the protection of FLSA. To hold otherwise would be to conclude that Congress' power to legislate is subject to the courts' invocation of choice of law principles.
 
 
 35
 The Supreme Court's analysis in Vermilya-Brown Co., Inc. v. Connell, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948), illustrates this proposition. There, the Court considered the question of whether FLSA covered employees working on a United States base in Bermuda. The Court held that the leased base area was a "possession" of the United States within the meaning of FLSA and that it was the intent of Congress in its use of "possession" to have the Act apply to employees of American contractors engaged in the construction of military bases on foreign territory under a leasehold of the United States. Although Congress' subsequent amendment of FLSA to specifically exclude such territories from coverage altered the Court's conclusion,[5] the case is still instructive in that the Court analyzed the question in terms of statutory interpretation and not choice of law.
 
 
 36
 A more recent Supreme Court decision also demonstrates that the extraterritorial application of a federal statute is a matter of statutory interpretation rather than choice of law analysis. In EEOC v. Arabian American Oil Co., --- U.S. ----, 111 S.Ct. 1227, 113 L.Ed.2d 274, (1991) although it did not concern foreign nationals as here, the Court held that Title VII of the Civil Rights Act of 1964 was not applicable to United States citizens employed abroad by American employers. Title VII, similar to FLSA, subjects employers to its terms if the employer is "engaged in an industry affecting commerce." 111 S.Ct. at 1231. The Supreme Court defined its task as "determin[ing] whether Congress intended the protections of Title VII to apply to United States citizens employed by American employers outside of the United States." 111 S.Ct. at 1230. That task, held the Court, was "a matter of statutory construction." Id. Indeed, the Court did not even consider approaching the question in terms of choice of law.[6]
 
 
 37
 Thus, the applicability of FLSA is a matter of statutory interpretation rather than choice of law analysis. See also, Windward Shipping (London) Ltd. v. American Radio Ass., 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) (In determining whether the National Labor Relations Act applied to unions picketing foreign ships employing foreign nationals, the Supreme Court analyzed question in terms of whether the activities complained of were activities "affecting commerce" within the meaning of the Act and not under choice of law principles.) and McCulloch v. Sociedad Nacional, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963) (same).
 
 B. Statutory Requirements
 
 38
 As originally passed, FLSA exempted from both minimum wage and overtime requirements "any employee employed as a seaman." See 29 C.F.R. Sec. 783.28. In 1961, Congress amended FLSA to bring seamen employed on American vessels under the Act. Section 13(a)(14) was amended so that the minimum wage and overtime provisions did not apply to "any employee employed as a seaman on a vessel other than an American vessel." American vessel is precisely defined in 29 U.S.C. Sec. 203(p) as "includ[ing] any vessel which is documented or numbered under the laws of the United States."[7]
 
 
 39
 The eleven reflagged tankers squarely meet the definition of an American vessel provided in FLSA. These eleven vessels were documented under the laws of the United States so that they were permitted to fly the American flag. The plaintiffs also meet the definition of seamen: the employees perform "service which is rendered primarily as an aid in the operation of such vessel as a means of transportation." 29 C.F.R. Sec. 783.31. Thus, the plaintiffs have met one prong of the two prong requirement for seamen to come under FLSA.
 
 B.(1) The "In Commerce" Requirement
 
 40
 The second requirement that the Filipino seamen employed on the eleven reflagged tankers must meet is the "in commerce" requirement of FLSA. 29 U.S.C. Sec. 206(a). The "in commerce" requirement is widely used as a prerequisite to the application of many federal statutes. FSLA uses the term more narrowly than other statutes, "Congress, by excluding from the Act's coverage employees whose activities merely 'affect commerce,' indicated its intent not to make the scope of the Act coextensive with its power to regulate commerce." Mitchell v. Lublin, McGraughy & Associates, 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959), citing Kirschbaum Co. v. Walling, 316 U.S. 517, 523, 62 S.Ct. 1116, 1120, 86 L.Ed. 1638 (1942). Although over the years Congress has expanded the scope of FSLA's application[8] and the Act is to be applied to "the furthest reaches consistent with congressional direction," Mitchell, 358 U.S. at 211, 79 S.Ct. at 264, Congress' intention that FSLA be limited to remedying labor conditions of workers employed in and living in the United States or specifically designated territories has remained unchanged.
 
 
 41
 The language of FLSA and its legislative history show that Congress intended the Act to establish minimum wage and maximum hour standards for workers employed in the domestic economy.[9] Congress' express purpose in passing FLSA was to protect a substantial portion of the national work force from sub-standard wages and excessive hours which endangered the national health and well-being and, as a result, "the free movement of goods in interstate commerce." Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 706, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945). Congress found that the channels and instrumentalities of commerce were being used to "spread and perpetuate such labor conditions among the workers of the several States..." and therefore enacted FLSA in 1938 for the purpose of rectifying labor conditions which were detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers. 29 U.S.C. Sec. 202 (emphasis supplied).
 
 
 42
 Thus, FLSA defines "in commerce" to include only those economic activities which 'touch' the United States at some point. Section 203(b) of FLSA defines commerce as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. Sec. 203(c) defines State as "any State of the United States or the District of Columbia or any Territory or possession of the United States."
 
 
 43
 In 1957, in reaction to the Supreme Court's decision in Vermilya-Brown Co., Inc. v. Connell, 335 U.S. 377, 69 S.Ct. 140, 93 L.Ed. 76 (1948), Congress amended FLSA to specify which United States territories were to be covered by FLSA. Congress amended the Act so that section 213(f) provided an exemption for work performed in a foreign workplace. (See footnote 5 for complete text of section 213(f)). In so doing, Congress noted that the Act was obviously "designed to apply to a United States economy, [and its application] to overseas areas is usually inconsistent with local conditions of employment, the level of the local economy, the productivity and skills of indigenous workers, and is contrary to the best interest of the United States and the foreign areas." Senate Rep. No. 987, reprinted in 1957 U.S.Code Cong. & Admin.News 1756-57.
 
 
 44
 Seamen thus present an unusual case because, unlike other workers potentially covered by FLSA, their services very often are not rendered within the United States or one of the enumerated territories. The uniqueness of the seamen's situation accounts for the lack of precedent for analyzing when commercial activities are sufficiently "domestic" to trigger application of FLSA. As shown above, however, a demonstrable connection to the American economy is critical to a finding of FLSA coverage.[10]
 
 
 45
 The first argument that plaintiffs make as to why these seamen should be considered to have been engaged "in commerce" within the meaning of FLSA is that the American flagged vessels constitute American territories and thus any trade they engage in is trade between a territory of the United States and a foreign country. This argument is not persuasive for two reasons.
 
 
 46
 First, if this theory is carried to its logical conclusion, the result is that these seamen are denied coverage. If the American-flagged vessels are considered American territories, then the employees of these vessels would be exempted from coverage under the foreign workplace exemption found at 29 U.S.C. 213(f). American-flagged vessels are not on the list of United States territories covered by FLSA.[11]
 
 
 47
 Second, the premise that a vessel flying the American flag, even though temporarily a flag of convenience, is a floating piece of American territory for all purposes wherever it may sail is untenable. "Flags of convenience" are a comparatively new phenomenon developed after the conclusion of World War II by certain non-traditional maritime countries for economic reasons. The state whose flag was flown exercised "minimum control over the activities and operations of these vessels." E. Osieke, Flags of Convenience Vessels: Recent Developments, 73 Am.J. of Inter.Law 604. It is generally understood among nations engaged in maritime practice that the state whose flag is flown exercises control over matters such as qualification of masters and officers of the ship, safety of the seas, discipline aboard the vessel, and investigations into instances of navigation causing destruction of life or serious physical damage. The law of the flag state over the ship in these matters is applied "on the pragmatic basis that there must be some law on shipboard [and] that it cannot change on every change in the waters." Lauritzen v. Larsen, 345 U.S. 571, 585, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953).
 
 
 48
 Thus, the concept of the "flag as a floating territory" is a legal fiction constructed under maritime law for the practical operational reasons stated above. Although this legal fiction "is undoubtedly true for some purposes," Patterson v. Eudora, 190 U.S. 169, 176, 23 S.Ct. 821, 823, 47 L.Ed. 1002 (1903), it is not an inflexible rule. "[W]e must move with the circumspection appropriate when this court is adjudicating issues inevitably entangled in the conduct of our international relations." Romero v. International Terminal Operating Co., 358 U.S. 354, 383, 79 S.Ct. 468, 486, 3 L.Ed.2d 368 (1959). To woodenly apply this legal fiction to the case at hand, thus expanding the doctrine "to the extent of treating seamen employed on such a ship as working in the country of its registry is quite impossible." Scharrenberg v. Dollar SS Co., 245 U.S. 122, 127, 38 S.Ct. 28, 29, 62 L.Ed. 189 (1917). It would serve none of the purposes and goals of FLSA as will be shown infra.
 
 
 49
 Plaintiffs next argue that the seamen are engaged in commerce or in an enterprise engaged in commerce because of Chesapeake's substantial commercial activity within the United States. Plaintiffs look to Chesapeake's activities in connection with the reflagging--the chartering of a United States-crewed and flagged vessel, the purchase of supplies and equipment from United States suppliers, and telecommunications maintained between the vessels and the United States--as activity constituting "commerce" within the meaning of FLSA.
 
 
 50
 Prior to the reflagging, no one could seriously argue that the shipping operations of KOTC were engaged "in commerce" within the meaning of FLSA. Accordingly, the argument that these seamen were engaged in commerce must necessarily turn on the claim that the arrangements made to comply with United States law in connection with the reflagging transformed this entirely foreign shipping operation into one engaged in United States commerce as defined by FLSA.
 
 
 51
 The transfer of ownership of the vessels to a United States corporation, Chesapeake, did not convert this shipping enterprise into one engaged in commerce within the terms of FLSA. The issue of whether an employee is engaged in commerce should be decided by applying practical standards rather than technical terms. Mitchell v. C.W. Vollmer & Co., 349 U.S. 427, 429, 75 S.Ct. 860, 861, 99 L.Ed. 1196 (1955). The technical formality of transferring the vessels to an American corporation for political purposes in no way altered the entirely foreign character of the shipping operations or the duties of the seamen. "Congress deemed the activities of the individual employees, not those of the employer, the controlling factor in determining the proper application of the Act." Mitchell v. Lublin, McGaughy & Assoc., 358 U.S. 207, 213, 79 S.Ct. 260, 265, 3 L.Ed.2d 243 (1959) (emphasis supplied).
 
 
 52
 After the reflagging, the nature of the work and the duties of the seamen in question continued as before. Generally, "[r]elevant for flag of convenience [considerations] ... [is] the nationality of the ultimate owner." B.A. Boczek, Flags of Convenience 169 (1962). Here, it is Kuwait. The vessels were immediately time-chartered back to KOTC, the former owner. The waters they plied, the ports at which they docked, and the goods they transported did not change. None of the ships ever docked in an American port as a result of the American flags they carried. The goods being transported, oil and petroleum products, never entered the United States, other than an isolated cargo of oil that was eventually transhipped to the United States. Although there is no de minimis requirement for application of FLSA, the contact with interstate commerce must be regular and not an isolated incident. Mabee v. White Plains Publishing Company, 327 U.S. 178, 181, 66 S.Ct. 511, 512, 90 L.Ed. 607 (1946); Marshall v. Victoria Transportation Company, Inc., 603 F.2d 1122, 1124 (5th Cir.1979). Other than a change in the flag these ships carried, the reflagging had absolutely no impact on the lives and work of these seamen. Indeed, Congress exacted a promise from Kuwait that the vessels would remain in "foreign trade" so that the waiver of dry-docking and other requirements did not "skew the marketplace." Hearings at 87-88. As such, the reflagging did not bring these seamen within commerce as defined by FLSA.
 
 B.(2) Enterprise Liability
 
 53
 Plaintiffs also contend that the defendants constitute an enterprise engaged in commerce. The first step in determining whether there is liability under FLSA due to the existence of an enterprise engaged "in commerce" is ascertaining which of the defendants--Chesapeake, Gleneagle, Santa Fe, KOTC, and KPC--constituted the enterprise. Enterprise is defined as:
 
 
 54
 the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units including departments of an establishment operated through leasing arrangements, but shall not include the related activities performed for such enterprise by an independent contractor ....
 
 
 55
 29 U.S.C. Sec. 203(r) (emphasis supplied). Thus, to be considered an enterprise, the corporations must satisfy each of three elements: the business must be (1) engaged in related activities (2) under unified operation or common control and (3) have a common business purpose. Donovan v. Easton Land & Development, 723 F.2d 1549, 1551 (11th Cir.1984).
 
 
 56
 The district court assumed that all the defendants constituted an enterprise. Although the facts underlying this conclusion are reviewed under the clearly erroneous standard of review, the legal conclusion that these defendants constitute an enterprise is subject to plenary review. Ram Construction Co., Inc. v. American States Insurance Co., 749 F.2d 1049, 1053 (3rd Cir.1984).
 
 
 57
 Under FLSA's definition, Gleneagle, the independent Delaware corporation responsible for providing supplies, fuel, victuals, repairs, customs entry and exit clearances, insurance, and other services for the operation of the vessels, cannot be considered part of the enterprise. The plaintiffs themselves acknowledge that Gleneagle is "wholly independent of the KPC family." Indeed, the plaintiffs could not claim otherwise; there exists no affiliation between Gleneagle corporation and the other defendants. Gleneagle is simply "a worldwide vessel management corporation" that has contracted its services to Chesapeake. As an independent contractor, it cannot be considered part of an enterprise and therefore the activities of Gleneagle cannot be considered as contributing to the commercial activity by Chesapeake in the United States. Moreover, Gleneagle re-delegated its duties, with the exception of providing radio masters, to KOTC.
 
 
 58
 Likewise, Santa Fe, a Kuwaiti-owned corporation chartered under United States law, cannot be considered part of the enterprise. Although Santa Fe appears to meet the first two requirements of "related activities" and "common control", it fails to meet the third requirement that Santa Fe and Chesapeake be in pursuit of a "common business purpose."
 
 
 59
 The term "related activities" is defined as "auxiliary and service activities such as central office and warehousing activities and bookkeeping, auditing, purchasing, advertising and other services .... including all activities which are necessary to the operation and maintenance of the particular business." C.F.R. Sec. 779.206. Sante Fe entered into a management contract to perform administrative, accounting, and professional services for Chesapeake. Under the above definition, it appears that these activities would be considered "related." Santa Fe also appears to be under "common control" with Chesapeake. Santa Fe is wholly owned by KPC. Chesapeake is wholly owned by KOTC which, in turn, is wholly owned by KPC. Thus, both Chesapeake and Santa Fe are under common control of KPC. In addition, most of Chesapeake's officers and directors were also officers of Santa Fe.
 
 
 60
 However, plaintiffs make no showing that Santa Fe and Chesapeake are engaged in a "common business purpose." Although Santa Fe does perform "related activities," something more is required under the Act to render them engaged in a common business purpose. Otherwise, the third requirement would be superfluous. "There must be more than a common goal to make a profit to satisfy the common business purpose requirement." Donovan, 723 F.2d 1549, 1553. Santa Fe was incorporated in 1983, years prior to the reflagging, and consequently must have served some purpose other than providing auxiliary services to Chesapeake. The plaintiffs do not provide any information as to the nature of Santa Fe's business or any argument as to why Santa Fe's business purpose has been common with that of Chesapeake's. Moreover, these services were performed in furtherance of an entirely foreign shipping operation. As such, and on this record, Santa Fe cannot be considered part of the business enterprise with Chesapeake.
 
 
 61
 Having determined that only Chesapeake can be considered part of the enterprise[12], we must next determine whether Chesapeake is an enterprise engaged in commerce. An "enterprise engaged in commerce or in the production of goods for commerce" is defined as an enterprise that "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person...." 29 U.S.C. Sec. 203(s)(1) and (A)(i). The main purpose of the 1961 amendment adding enterprises engaged "in commerce" was to extend FLSA coverage to "employees mainly in large retail and service enterprises." 1961 U.S.Code Cong. & Admin.News 1621 (reprinting Senate Report No. 145).
 
 
 62
 Although FLSA's original definition of "in commerce" focused on whether the employees themselves were engaged in commerce, the definition of enterprise focused on the business entity itself. Donovan v. Scoles, 652 F.2d 16, 18 (9th Cir.1981), cert. denied, 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 460 (1982). The amendment extending coverage to enterprises engaged in commerce provided FLSA protection to two groups of employees. The first prong of the definition (an enterprise that has employees engaged in commerce) extended coverage to all the co-workers of employees covered by the original version of FLSA. The second prong ("including employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person") extends FLSA protection to employees of an enterprise that uses goods that have moved through interstate commerce. Donovan v. Scoles, 652 F.2d at 18.
 
 
 63
 Plaintiffs argue that the chartering of the United States-flagged and crewed vessel renders Chesapeake an enterprise engaged in commerce. Chesapeake chartered the vessel, the Ocean Wizard (later replaced by the Ocean Runner), to ensure that it would "retain U.S. naval presence" in the Gulf even if "legislative problems" forced the deflagging of the eleven tankers. However, the Ocean Wizard and the Ocean Runner engaged in exactly the same trading patterns as the rest of the Chesapeake fleet. The use of these ships was indistinguishable from the eleven reflagged vessels and therefore, these vessels were not engaged "in commerce" within the terms of the FLSA for the same reasons. The course these vessels sailed, the ports at which they docked, and the goods they transported were entirely foreign and outside of the United States geographically and outside of its economy.
 
 
 64
 Plaintiffs also argue that the purchase of supplies and equipment from American suppliers renders Chesapeake susceptible to FLSA requirements. Once again, however, the purpose of the enterprise amendment was to extend FLSA protection to workers employed in the domestic economy. Congress tied the coverage of workers employed in service and retail industries to the use of goods traveling through interstate commerce so that Congress would not exceed its constitutional power derived from the commerce clause.
 
 
 65
 Under plaintiff's rationale, a company chartered under an American state law that purchased goods in the United States would be an enterprise engaged in commerce and thus be required to comply with FLSA. Normally, this would be true. Here, however, we have an extraordinarily unique situation. In the present case, Chesapeake purchased the supplies solely to bring the eleven vessels into compliance with Coast Guard regulations and not in the production of goods or the performance of services for interstate commerce. Compliance with these safety requirements was necessary for reflagging, a decision entirely motivated by political reasons. Once the retrofitting of the ships was accomplished, purchase of United States supplies ceased. As such, the purchase of equipment and supplies used to bring these ships into compliance with safety regulations did not transplant what was essentially a foreign shipping operation into a domestic operation within the intent and purpose of the FLSA.[13]
 
 
 66
 Flying the American flag is a necessary but not sufficient condition for seamen to obtain the benefits of FLSA. Here, the American flag flew to give notice that these vessels were entitled to the military protection of the United States. Such symbolism is not a valid substitute for involvement in the American economy within the meaning of FLSA. Plaintiffs' counsel invites the court to adopt a highly technical reading of FLSA in support of a conclusion which flies in the face of common sense, maritime practice, and Congress' intent in passing FLSA. Kuwait reflagged these eleven ships to obtain the military protection of the United States. All incidental corporate restructural activity with the United States was mandated by the reflagging, a purely political act. The United States' offer of military protection to these vessels is a far cry from exerting its jurisdiction to dictate the wages this shipping operation must pay to its foreign employees who never performed any work on American soil or territory designated by the Act, and who were not engaged in the performance of service relating to goods produced in the United States.
 
 
 67
 The purpose behind Congress' explicit exclusion of ships flying foreign flags was presumably to avoid interference in the delicate field of international relations by imposing domestic labor law on foreign ships employing foreign nationals at foreign wages. Although these eleven ships flew the American flag, the goods they carried, the trading patterns in which they engaged, and the seamen they employed were entirely foreign. The plaintiffs' contract of employment, negotiated by a Philippine labor union and approved by POEA, was a carefully and validly drawn document granting the POEA exclusive jurisdiction over any and all disputes arising out of the contract. Without serving any interests or concerns of the United States, we are asked to brush aside this contract. We cannot read into FLSA "an intent to change the contractual provisions made by these parties. For us to run interference in such a delicate field of international relations there must be present the affirmative intention of Congress explained. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord is so evident and retaliative action so certain." Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957). To hold that these seamen are entitled to a minimum wage calculated to maintain a minimal living standard in the United States would be an astonishing circumvention of Congressional intent and a potential source of friction between the United States and the foreign countries involved.
 
 
 68
 We hold that foreign seamen employed on vessels engaged in foreign operations entirely outside of the United States, its waters and territories do not become subject to FLSA when their vessels are transitorily reflagged under the United States flag and transferred to a corporation chartered under the laws of an American state and immediately leased back to the foreign operating company, even though, to comply with American maritime safety laws, it initially purchased some goods moving in interstate commerce in the United States.[14]
 
 III.
 
 69
 In sum, because I believe that the plaintiffs were not engaged in commerce nor part of an enterprise engaged in commerce within the meaning of FLSA and because Judge Cowen concurs in the judgment, the judgment of the district court will be affirmed.
 
 APPENDIX A
 
 70
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 71
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 72
 COWEN, Circuit Judge, concurring in the judgment only.
 
 
 73
 I would affirm the district court's ordergranting summary judgment to defendants. Unlike my brethren, though, I do not reach the question of whether the Fair Labor Standards Act, 29 U.S.C. Sec. 201-219 ("FLSA"), entitles plaintiffs to minimum wages and other benefits. Rather, I write separately because choice of law principles preclude the application of American law in the first place.
 
 
 74
 A series of United States Supreme Court decisions governs the choice of law analysis in admiralty cases. Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The Lauritzen triad establishes an eight-factor balancing test to determine if a sufficient American interest exists to justify the application of American law to an admiralty dispute. DeMateos v. Texaco, Inc., 562 F.2d 895, 900-01 (3d Cir.1977). Those eight factors, not all of which should be accorded equal weight, are: (1) the place of injury; (2) the country of the ship's flag; (3) the allegiance or domicile of the injured seamen; (4) the allegiance of the shipowner; (5) the place of contract; (6) the inaccessibility of a foreign forum; (7) the law of the forum; (8) and the defendant's base of operations. Matute v. Procoast Navigation Ltd., 928 F.2d 627, 631-32 (3d Cir.1991). A court must evaluate these factors with an eye towards the national interest at stake. Hellenic Lines Ltd. v. Rhoditis, 398 U.S. at 309, 90 S.Ct. at 1734; Matute v. Procoast Navigation Ltd., 928 F.2d at 631-32.
 
 
 75
 Applying the Lauritzen test to the facts of this case, I conclude, as did the district court, that foreign law controls.[1] Two factors favor the application of American law to this matter. Most importantly, the ships on which the plaintiffs worked flew the American flag.[2] Additionally, the American forum entertaining this matter has an interest in drawing the parties under the control of its law. But these factors are of limited significance; as the district court stated, the overriding American interest in reflagging the tankers was the safeguarding of "United States security and foreign policy objectives in the Persian Gulf." Cruz v. Chesapeake Shipping, Inc., 738 F.Supp. 809, 817 (D.Del.1990). This interest would hardly be served by the application of American labor law.
 
 
 76
 All other Lauritzen factors point in opposite directions. Plaintiffs' domicile is the Philippines, which is also where the employment contracts were negotiated and signed. Provisions in the employment contracts stated that disputes arising under the contracts are to be resolved in Filipino forums pursuant to Filipino law. Since the place of contract was the Philippines, that nation might have been the place of injury. Conceivably, the place of injury could also have been one of the foreign countries where the plaintiffs were paid.
 
 
 77
 The defendants, for the most part, owe their allegiances to Kuwait. Similarly, defendants' base of operations is Kuwait. Weighing all contacts, then, it becomes apparent that American interests are so insignificant that American law cannot be exported to this case.[3]
 
 
 78
 However, my brethren take the position that choice of law analysis is inappropriate in this instance because Congress, in formulating the relevant provisions of the FLSA, has made the choice of law for us. I respectfully disagree. The Supreme Court has recognized that the Lauritzen triad was "intended to guide courts in the application of maritime law generally." Romero v. International Terminal Operating Co., 358 U.S. at 382, 79 S.Ct. at 485. As Judge Rosenn noted, though, if the legislature " 'has actually addressed itself to the choice of law problem, the courts ... must give effect to its intentions.' " Lauritzen v. Larsen, 345 U.S. at 579 n. 7, 73 S.Ct. at 926 n. 7 (quoting Cheatham and Reese, Choice of the Applicable Law, 52 Col.L.Rev. 959, 961 (1952)).[4] But Congress has not "actually addressed" choice of law in the FLSA.
 
 
 79
 A recent Supreme Court decision provides guidance in determining when Congress has dictated to us a choice of law. In EEOC v. Arabian American Oil Co., --- U.S. ----, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("Aramco"), the Court held that Title VII's provisions do not extend to American citizens employed abroad by American employers. It is well-established that all congressional legislation is presumed to apply only within the territorial jurisdiction of the United States. Id. 111 S.Ct. at 1230. The court stated that this presumption could only be overcome if the party seeking protection of American law demonstrates a "clearly expressed" and "affirmative" congressional intent to the contrary. Id. Petitioners, unable to offer any "specific language" indicative of congressional intent, id. at 1232, relied on inferences deduced "from boilerplate language which can be found in any number of congressional acts." Id. at 1232. These inferences produced no more than "plausible" interpretations of Title VII which were matched by equally plausible interpretations presented by the respondents. Id. Thus, the Court concluded that the petitioner employees failed to meet their burden of showing the clearly expressed congressional intention necessary to overcome the presumption of territoriality. Significantly, the Court reached its decision only after remarking that "had Congress intended Title VII to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures." Id. at 1234.
 
 
 80
 The reasoning of Aramco should control our disposition of this issue. If Congress had intended to resolve conflicts between the FLSA and other nations' labor laws in favor of American law, it was required to draft the FLSA in a manner which affirmatively and clearly expressed such intent. This, Congress did not do. The relevant provision of the FLSA, 29 U.S.C. Sec. 206, does not address choice of law in "specific language;" indeed, it is silent on the matter. To mine any nugget of congressional intent, we must resort to "boilerplate language" which, as Judge Alito concedes, "does not definitively reveal whether Congress intended to specify a choice-of-law rule." Op. of Judge Alito at 235-36. Given these observations, it cannot be said that Congress has affirmatively and clearly expressed its intent to make a choice of law.[5]
 
 
 81
 Absent a clearer indication of intent from Congress, I am convinced that a choice of law analysis in this case is required. Because that analysis reveals the inappropriateness of applying American law, I would affirm the district court's order granting summary judgment.
 
 
 82
 ALITO, Circuit Judge, dissenting.
 
 
 83
 The majority affirms the decision of the district court holding that the plaintiffs in this case, foreign seamen on American-flag ships engaged in trade between foreign ports, were not covered by the minimum wage provision of the Fair Labor Standards Act (FLSA), 29 U.S.C. Sec. 206. The district court concluded: first, that American law did not apply under choice-of-law principles taken primarily from cases involving the Jones Act, 46 U.S.C. Sec. 688; second, that neither the seamen nor the enterprises that employed them were engaged in "commerce" within the meaning of the FLSA because their activities lacked sufficient connection with the United States; and third, that the seamen were excluded from coverage by the "foreign workplace exemption," 29 U.S.C. Sec. 213(f), which applies to employees who labor "in a workplace within a foreign country." Because Congress, in my view, clearly intended for the FLSA's minimum wage provision to apply to all seamen on all American-flag ships, I respectfully dissent.
 
 I: CHOICE OF LAW
 
 84
 A. In determining whether the FLSA's minimum wage provision governs the present case, we must first examine Congress's intent. When Congress dictates a choice of law by statute, courts must of course comply. See, e.g., Lauritzen v. Larsen, 345 U.S. 571, 579 n. 7, 73 S.Ct. 921, 926 n. 7, 97 L.Ed. 1254 (1953); Restatement (2nd) Conflict of Laws Sec. 6(1) (1971).
 
 
 85
 Analysis of Congress's intent in enacting the relevant provisions of the FLSA must, in turn, begin with the statutory language. If statutory language is unambiguous, it must be followed absent exceptional circumstances. Demarest v. Manspeaker, --- U.S. ----, ----, 111 S.Ct. 599, 602, 112 L.Ed.2d 608 (1991); Russello v. United States, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983).[1]
 
 
 86
 B. The statutory language relevant to the choice-of-law issue appears in 29 U.S.C. Sec. 206(a), which provides in pertinent part as follows:
 
 
 87
 Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates: ...
 
 
 88
 (4) if such employee is employed as a seaman on an American vessel, not less than [a specified amount.]
 
 
 89
 This language does not definitively reveal whether Congress intended to specify a choice-of-law rule. On the one hand, the language of Section 206(a)(4) may plausibly be construed as a statutory directive to apply American law (the FLSA minimum wage provision), thus precluding application of nonstatutory choice-of-law principles. In other words, the language of Section 206(a)(4) may in effect be read as follows: "[e]very employer shall pay to each of his employees," in a commerce-related job the FLSA minimum wage "if such employee is employed as a seaman on an American vessel."
 
 
 90
 On the other hand, the language of Section 206(a)(4) may also be reasonably interpreted as leaving open the choice-of-law question, thus necessitating the application of nonstatutory choice-of-law principles. Under this interpretation, Section 206(a)(4) would merely specify the minimum wage rate for seamen on American vessels in those instances in which the choice of American law is appropriate. In other words, the language of Section 206(a)(4) may in effect be construed as follows: "[e]very employer shall pay to each of his employees," in a commerce-related job, minimum wages at certain rates, and "if such employee is employed as a seaman on an American vessel," the rate must be "not less than [a specified amount]." Because I believe that the language of Section 206(a)(4) does not foreclose either of these interpretations, examination of the relevant legislative history is proper.
 
 
 91
 C. Unlike the statutory language, the legislative history of the FLSA makes clear that Congress intended for the minimum wage requirement to apply to all seamen on all American vessels. The evolution of the minimum wage provision, 29 U.S.C. Sec. 206(a), is particularly instructive. Before 1961, Section 13(a) of the FLSA, 29 U.S.C. Sec. 213(a) (1958 ed), excluded all seamen from the coverage of the minimum wage provision.[2] In 1961, the exclusion was narrowed to seamen on foreign vessels.[3] At the same time, the minimum wage provision, 29 U.S.C. Sec. 206(b) (1958 ed.), was also amended to read in pertinent part as follows (Pub.L. 87-30, sec. 5(b), 75 Stat. 65 (1961)):
 
 
 92
 Every employer shall pay to each of his employees who in any workweek ... (ii) is brought within the purview of this section by the amendments made to section 13(a) of this Act by the Fair Labor Standards Amendments of 1961, wages at [specified rates].
 
 
 93
 This language made clear that the minimum wage requirement was meant to apply to all seamen on all American vessels. All such seamen were "brought within the purview of [the minimum wage provision] by the [1961] amendments to section 13(a) of the [FLSA]," and therefore employers were required to pay the FLSA minimum wage to all such seamen.
 
 
 94
 The current version of the minimum wage requirement, 29 U.S.C. Sec. 206(a), which is susceptible to the two interpretations discussed above, dates from the Fair Labor Standards Amendments of 1966, Pub.L. 89-601, 80 Stat. 830, sec. 301. As the relevant House and Senate Reports stated, however, this amendment was not intended "to make any substantive change, but rather merely rearrange[d] the order of the provisions of the ... act." H.R.Rep. No. 1366, 89th Cong., 2d Sess., at 43 (1966); S.Rep. No. 1487, 89th Cong., 2d Sess. [1966 U.S.Code Cong. & Admin.News 3002, 3034]. Thus, the evolution of the minimum wage provision plainly shows that this provision was meant to apply to all seamen on American ships.
 
 
 95
 The congressional reports issued at the time of the 1961 amendments fortify this conclusion. The Senate Report stated (S.Rep. No. 145, 87th Cong., 1st Sess. [1961 U.S.Code Cong. & Admin.News at 1628] (emphasis added)): "The committee bill covers for minimum wage but not for overtime seamen on American-flag vessels." Subsequently, the Report added (id. at 1851-52) (emphasis added):
 
 
 96
 The present act in section 13(a)(14) provides an exemption from its minimum wage and overtime provisions for all seamen. Under the bill all seamen will continue to be exempt from the overtime provisions. However, seamen on vessels documented or numbered under the laws of the United States will be covered by the minimum wage requirements.
 
 
 97
 Identical language appeared in the House Report. H.R.Rep. No. 75, 87th Cong., 1st Sess. 13-14 (1961). See also id. at 5, 36. Similarly, the Conference Report (Conf.Rep. No. 327, 87th Cong. 1st Sess. [1961 U.S.Code Cong. & Admin.News 1706, 1710] (emphasis added)) stated: "The Senate Amendment and the conference substitute (Secs. 13(a)(14) and 13(b)(6)) change the complete exemption contained in the present law for all seamen to provide minimum wage coverage for seamen on American vessels."
 
 
 98
 In sum, the legislative history manifests an unambiguous congressional intent to provide minimum wage protection for all seamen on American vessels. This congressional intent would be thwarted if the FLSA's coverage of seamen on American vessels depended, as the district court held, on a weighing of the eight factors relevant to the choice of law in Jones Act cases.[4]
 
 II: COMMERCE
 
 99
 A. The FLSA minimum wage provision applies to employees who are "engaged in commerce" or "employed in an enterprise engaged in commerce." 29 U.S.C. Sec. 206(a)(4). Under the FLSA, "commerce" is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. Sec. 203(b). A "State" is defined as "any State of the United States or the District of Columbia or any Territory or possession of the United States." 29 U.S.C. Sec. 203(c).
 
 
 100
 The meaning of the FLSA "commerce" requirement, 29 U.S.C. Sec. 206(a)(4), is ambiguous as applied to American vessels engaged in trade between or among foreign ports. On the one hand, the term "commerce" in 29 U.S.C. 206(a) may be interpreted not to include trade between or among foreign ports. Such trade is not, in the most literal sense, trade "among the several States or between any State and any place outside thereof." 29 U.S.C. Sec. 203(b).
 
 
 101
 On the other hand, I am not convinced that a somewhat less literal interpretation may be rejected without closer scrutiny. In defining "commerce" to include trade between any State, Territory, or possession and any foreign place, Congress seems to have intended in essence to define "commerce" to include trade between the United States (which consists of all the States, Territories, and possessions) and any foreign place. Vessels flying the American flag have long been regarded "as part of the territory of [the] nation." Patterson v. Eudora, 190 U.S. 169, 176, 23 S.Ct. 821, 823, 47 L.Ed. 1002 (1903); see also Lauritzen v. Larsen, 345 U.S. 571, 585, 73 S.Ct. 921, 929, 97 L.Ed. 1254 (1953); Ross v. McIntyre, 140 U.S. 453, 477, 11 S.Ct. 897, 904, 35 L.Ed. 581 (1891); Restatement of the Foreign Relations Law of the United States Sec. 501 (1987). (Indeed, the vessels involved in the present case were permitted to fly the American flag precisely for the purpose of invoking this principle and thereby deterring potential attacks). Thus, the transfer of goods between an American-flag vessel and a foreign place may reasonably be regarded as trade between the United States and a foreign place and thus as "commerce" under the FLSA.
 
 
 102
 Because the statutory language relating to "commerce" may reasonably be construed in either of the ways noted above, examination of the legislative history is justified.
 
 
 103
 B. The legislative history clearly shows that Congress assumed the "commerce" requirement would pose no obstacle for seamen on American vessels. Once again, the language Congress adopted in the 1961 FLSA amendments ending the exclusion of seamen on American vessels is critical. As previously noted, the minimum wage provision was amended in 1961 to read in pertinent part as follows (Pub.L. 87-30, sec. 5(b), 75 Stat. 65 (1961)):
 
 
 104
 Every employer shall pay to each of his employees who in any workweek ... (ii) is brought within the purview of this section by the amendments made to section 13(a) of this Act by the Fair Labor Standards Amendments of 1961, wages at [specified rates].
 
 
 105
 Under this statutory language in the 1961 amendment, seamen on American vessels did not have to satisfy any commerce requirement whatsoever. Every employer was required to pay the FLSA minimum wage to every employee brought within the coverage of the minimum wage provision by the amendments to section 13(a), and all seamen on American vessels fell within that category.
 
 
 106
 The "commerce" test currently included in 29 U.S.C. Sec. 206(a) resulted from the 1966 technical amendment noted earlier; but as previously discussed, that technical amendment was not intended to effect any substantive changes. See dissenting at 236. Thus, the legislative history reveals that Congress never contemplated that seamen on American vessels would be denied minimum wage coverage based on a "commerce" requirement.
 
 
 107
 In light of Congress's clear intent in enacting the 1961 and 1965 FLSA amendments, I am persuaded that "commerce" under the FLSA should be construed to include trade, commerce, transportation, transmission, or communication between an American vessel and any place outside thereof. This interpretation is consistent with the statutory language and effectuates Congress's unmistakable intent.
 
 III: FOREIGN WORKPLACE EXEMPTION
 
 108
 A. The "foreign workplace exemption," 29 U.S.C. Sec. 213(f), excludes from FLSA coverage those employees "whose services during the workweek are performed in a workplace within a foreign country." This language may reasonably be construed not to apply to seamen employed on American ships, since an American Vessel may be regarded as part of the United States. Interpreting this language to apply to seamen on American vessels is more dubious. Conceivably Congress might have regarded an American ship as "a workplace within a foreign country" while the vessel was docked in a foreign port or sailing in foreign territorial waters. But this interpretation would apparently mean that seamen on American vessels would lose and regain FLSA coverage as their ships passed between the high seas and foreign waters.
 
 
 109
 In any event, the legislative history already explored leaves no doubt that the foreign workplace exemption was not intended to apply to seamen on American ships. As previously shown, the congressional committee reports issued in connection with the 1961 FLSA amendments disclosed that Congress intended to provide minimum wage coverage for all seamen on American vessels. See dissenting at 236. Moreover, these reports specifically noted that fully half of the seamen on American vessels were employed on deep-sea vessels. S.Rep. No. 145, supra, [1961 U.S.Code Cong. & Admin.News at 1652]; H.R.Rep. No. 75, supra, at 14. Congress surely realized that many such vessels spent considerable periods of time in foreign ports and territorial waters. Yet Congress expressly indicated that it intended to provide minimum wage coverage for seamen on American deep-sea vessels and gave no indication that it wished to limit that coverage to time not spent in foreign ports or waters. Thus, I am convinced that an American vessel should not be regarded as a "workplace within a foreign country" under 29 U.S.C. 213(f).
 
 
 110
 In conclusion, I believe that the FLSA minimum wage provision applies to all seamen on all American ships. I would therefore reverse the decision of the district court.
 
 
 
 [1]
 Seamen are exempted from the overtime provisions of FLSA by section 213(b)(6)
 
 
 [2]
 Some of the members of Congress expressed dismay at the Hearings that the Kuwaiti tankers would be allowed to be manned by non-United States citizens. For example, Mr. Lent inquired whether they were "missing a golden opportunity for our country in not insisting that the Kuwaitis in this situation utilize American crew people?" Mr. Lent expressed concern that a foreign crew would add to the danger posed to American naval vessels guarding them due to the difficulty in communication. (Hearings at 46). Others were concerned that "the Coast Guard's liberal interpretation of the manning laws could have a disastrous effect on United States jobs if other operators take advantage of this loophole to evade United States manning laws." Id. at 10. These concerns resulted in the above-mentioned amendment to section 8103 which eliminated the foreign-to-foreign exception to United States citizen manning requirements. See Commercial Fishing Industry Vessel Anti-Reflagging Act of 1987, Pub.L. 100-239, 101 stat. 1778 (1988). On February 9, 1988, two days before the new law was to take effect, the Secretary of Defense asked the Coast Guard to waive the 11 reflagged vessels' compliance with the more stringent manning requirements. The Coast Guard granted the waiver, thereby permitting the continued operation of the reflagged vessels with U.S. citizen masters and radio officers, but foreign crews. In National Marine Engineers' Beneficial Association v. Burnley, 684 F.Supp. 6 (D.D.C.1988), the court upheld the waiver as within the authority of Secretary of Defense
 
 
 [3]
 Naess is not a defendant in this suit; plaintiffs dropped Naess as a defendant in their Third Amended Complaint
 
 
 [4]
 Santa Fe is actually directly owned by KPC (US Holdings) which in turn is owned by KPC. KPC (US Holdings) was initially named as a defendant, but was dismissed from the case by stipulation
 
 
 [5]
 In 1957, Congress amended FLSA so that section 213(f) provided that "sections 206, 211 and 212 of this title shall not apply with respect to any employee whose services during the workweek are performed within a foreign country or within territory under the jurisdiction of the United States other than the following: a State of the United States; the District of Columbia; Puerto Rico; the Virgin Islands; outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act; American Samoa; Guam; Wake Island; and the Canal Zone."
 
 
 [6]
 Interestingly, the concurring opinion cites EEOC v. Arabian American Oil Co. as support for the proposition that a choice of law analysis is appropriate here. This conclusion confuses statutory interpretation and conflict of law analysis. The Court noted that had Congress intended Title VII to apply extraterritorially, then Congress would have had addressed the subject of conflicts with foreign laws. 111 S.Ct. at 1242. In no way did the Court hold that one looks to choice of law principles in determining whether a federal statute applies overseas
 
 
 [7]
 Use of the word "includes" is a term of enlargement and not a word of limitation. The term may apply to vessels that do not fall within the illustrations given, for instance, vessels plying the purely internal waters of a State if the seamen are "engaged in commerce or in the production of goods for commerce." 29 C.F.R. Sec. 783.42
 
 
 [8]
 The greatest expansion of the coverage of FLSA occurred in 1961 when Congress amended the Act to extend FLSA protection to employees of "enterprise[s] engaged in commerce." 29 U.S.C. Sec. 206(a). See section (b)(2) of opinion
 
 
 [9]
 Similarly, other federal statutes governing employee working conditions have been denied extraterritorial application. See, e.g., Windward Shipping Ltd. v. American Radio Assn., 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) (Respondents' picketing of foreign vessels employing foreign crewmembers docked at a United States port did not "affect commerce" within the meaning of the National Labor Relations Act); Foley Bros., Inc. v. Filardo, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949) (Eight Hour Law does not apply to a contract between the United States and a private contractor for construction work in a foreign country); Independent Union of Flight Attendants v. Pan American World Airways, Inc., 923 F.2d 678 (9th Cir.1991) (Railway Labor Act does not apply to purely foreign flying); and Cleary v. United States Lines, Inc., 728 F.2d 607 (3d Cir.1984) (Age Discrimination in Employment Act does not apply to Americans employed outside the United States by American employers)
 
 
 [10]
 The dissent contends that "seamen on American vessels d[o] not have to satisfy any commerce requirement whatsoever." Dissent at 238. This is contrary to the plain language of the statute. Section 206(a) provides that:
 Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [specified rates.]
 29 U.S.C. Sec. 206(a) (West Supp.1990) (emphasis added). The dissent, however, would have us create an ambiguity in the statutory language by tracing its evolution to its present form. Not only is this a novel theory of statutory construction, i.e. the courts are free to ignore the plain language of a statute as it exists today as long as an ambiguity can be detected in its history, it is also unsupported by the legislative history.
 The dissent argues that the old form of the statute did not require seamen to fulfill the commerce requirement. In 1961, when Congress amended FLSA to eliminate the exclusion of seamen as well as other employees, Congress provided in subsection 206(b) that these newly covered employees would receive a gradual pay increase. The dissent argues that because this subsection does not itself mention the commerce requirement, these employees were not required to meet that requirement. However, subsection 206(a) states the "in commerce" requirement and a restatement in (b) would be redundant.
 Moreover, this argument proves too much. This subsection applied to all employees newly covered by the 1961 amendments, not just seamen. The dissent's interpretation leads to the untenable position that all employees brought under the Act by the 1961 amendments were not required to meet the commerce requirement.
 Finally, the legislative history is devoid of any discussion to make a special exemption from the commerce requirement for seamen. Statements such as "seamen on [American] vessels ... will be covered by the minimum wage requirements" do show, as the dissent points out, that "Congress assumed that the commerce requirement would pose no obstacle for seamen on American vessels." (Dissent at 238). But this is all the statement shows. It does not show a Congressional intent to apply the minimum wage provision to seamen who, because of the unusual circumstances of this case, fail to satisfy the commerce requirement. Indeed, the language of FLSA and its legislative history, as discussed in the text above, demonstrates Congress' concern with limiting FLSA's application to domestic working conditions.
 
 
 [11]
 See footnote 5 for a complete listing of the territories covered by FLSA
 
 
 [12]
 The activities of KOTC and KPC, Kuwaiti corporations conducting their business in Kuwait, are not "in commerce" and thus cannot be seen as part of an enterprise engaged in commerce under FLSA
 
 
 [13]
 Likewise, the telecommunications maintained between the eleven vessels and the United States did not render this enterprise engaged in commerce within the terms of the FLSA. These communications were purely internal to the business and thus incidental to its operations. See Stevens v. Welcome Wagon International, Inc., 390 F.2d 75, 77 (3rd Cir.1968). As such, the present situation is distinct from the employees discussed in the Wage and Hour Division Public Domain Letter, dated April 11, 1966, who were engaged in the business of internation satellite communications
 
 
 [14]
 Having held that the plaintiffs were not engaged "in commerce" within the meaning of FLSA, we do not reach the question of whether the district court erroneously held that the plaintiffs were not entitled to FLSA protection because the eleven vessels came under the foreign workplace exemption of 213(f). We do note, however, that a vessel traveling from foreign port to foreign port is not in itself determinative of whether a ship is engaged "in commerce." The amicus brief, filed by District No. 1-MEBA/NMU of the AFL-CIO, raises the concern that American seamen employed on ships plying foreign waters will not be covered by FLSA. However, if these ships are "in commerce," these seamen will be covered by the terms of FLSA
 
 
 [1]
 Because the issue is not before us, I express no opinion as to what nation's laws would apply to this dispute
 
 
 [2]
 Plaintiffs argue that the law of the flag dictates our choice of law. In other words, plaintiffs believe that because the ships on which they worked were American ships, American law must apply to their claims. This contention is totally without merit. If the Supreme Court had wished the ship's flag to be the only consideration in choosing the applicable law, it would not have required analysis of seven other factors. While the country of the flag may be an important consideration, it is not the only one
 
 
 [3]
 This calculus would obviously have been different had the American contacts been more significant. For example, if the seamen were domiciled in the United States, American law would likely have applied. But the Filipino seamen in this instance did not even set foot in the United States during their employment. They were not paid in the United States. The ships on which they worked sailed exclusively from foreign port to foreign port, never once docking in an American port. American law cannot apply in these circumstances
 
 
 [4]
 Of course, any choice of law, whether performed by the legislature or the courts, must comport with strictures of the fifth amendment. DeMateos v. Texaco, Inc., 562 F.2d at 900-01
 
 
 [5]
 Judge Alito's argument that the legislative history of the FLSA supplies the requisite indicator of Congressional intent is unavailing for the same reasons. Nowhere is there a passage in the legislative history specifically directed toward choice of law. Moreover, the Aramco Court's refusal to discuss the legislative history of Title VII, despite a dissenting opinion which relied on that history extensively, would suggest that legislative history is irrelevant in our analysis
 
 
 [1]
 In EEOC v. Arabian American Oil Co., --- U.S. ----, ----, 111 S.Ct. 1227, 1229, 113 L.Ed.2d 274 (1991) (citation omitted), the Supreme Court invoked the canon of statutory construction that legislation is presumed not to apply "beyond places over which the United States has sovereignty or has some measure of legislative control" unless a contrary intent appears. Because the United States has sovereignty over American-flag vessels (see dissenting at 237-38), this canon of construction does not apply here
 
 
 [2]
 29 U.S.C. Sec. 213(a) (1958 ed.) provided:
 The provisions of sections 206 [minimum wage] and 207 [overtime] of [this] title shall not apply with respect to ... (14) any employee employed as a seaman ...
 
 
 [3]
 Section 13(a) was amended to read as follows:
 The provisions of sections 6 [29 U.S.C. Sec. 206] and 7 [29 U.S.C. Sec. 207] shall not apply with respect to--
 (4) any employee employed as a seaman on a vessel other than an American vessel.
 Pub.L. 87-30, sec. 9, 75 Stat. 65 (1961).
 
 
 [4]
 These factors, which were set out in Lauritzen v. Larsen, 345 U.S. at 583-93, 73 S.Ct. at 928-34, are: the place of act, the allegiance or domicile of the seaman, the allegiance or domicile of the shipowner, the place of the employment contract, the accessibility of a foreign forum, the law of the forum, and the shipowner's base of operations
 If the application of the FLSA's minimum wage provision depended on a case-by-case weighing of these eight factors, the obligations of shipowners and the rights of seamen under the FLSA would often be uncertain. While shipowners and seamen may not need to be able to predict with great accuracy whether American law will govern if a seaman is hurt and sues for personal injuries under the Jones Act, shipowners and seamen must be able to predict with some degree of certainty whether the FLSA minimum wage must be paid. The Lauritzen test, however, makes such predications nearly as difficult as possible. Not only does this test require a weighing and balancing of no fewer than eight factors, but some of the individual factors tend to produce shifting results totally unsuited for determining coverage of a minimum wage provision. For example, since "the place of the act" is one of the factors, a seaman might slip into and out of the coverage of the FLSA as he sailed from one destination to another. And since "the law of the forum" is another factor, a seaman's entitlement to the FLSA minimum wage might depend upon the court in which he brought suit. As the legislative history shows, Congress did not intend such results.