OIL SHIPPING (BUNKERING)
B.V., et al.

v.

The ROYAL BANK OF SCOTLAND plc,

and

Baytur Trading S.A.

INTERNATIONAL MARINE FUELS
OF SAN FRANCISCO, INC.,

v.

M/V ZIYA S, her engines boilers, tackle, etc., In Rem, Northwest Shipping Corporation, In Personam, Sonmez Denizcilik Ve Ticaret A/S, In Personam.

No. 92–CV–1793.

United States District Court,
E.D. Pennsylvania.

April 5, 1993.

---

Marjorie Singer Ochroch, Jeffrey S. Moller, Clark, Ladner, Fortenbaugh & Young, Philadephia, PA, for plaintiff/intervenor Baytur Trading, S.A.

Henry Lucas, Rawle & Henderson, Philadelphia, PA, for plaintiff Royal Bank.

Mary E. Reeves, Krusen, Evans, and Byrne, Philadelphia, PA, for Intern. Marine Fuels of San Francisco, Inc.

## MEMORANDUM

NEWCOMER, District Judge.

Presently before the court are three motions: Motion of Plaintiff/Intervenor Royal Bank of Scotland For Final Distribution of M/V ZIYA .S and Bunker Sale Proceeds; Motion of Plaintiff/Intervenor International Marine Fuels of San Francisco Inc. For Summary Judgment; and Motion of Plaintiff/Intervenor Baytur Trading S.A. For Partial Summary Judgment. For the reasons set forth below, all three motions will be treated in this Memorandum and the motions will be GRANTED, DENIED, and DENIED, respectively.

## I. *Factual Background.*

All three motions presently before the court share a common factual background that begins with the travels of the M/V ZIYA S, a bulk carrier ship which flew the Turkish flag. The M/V ZIYA S was operated by

Sonmez Denizcilik ve Ticaret A.S. (hereinafter "Sonmez"). Sonmez is a Turkish company with its primary place of business in Istanbul, Turkey. The M/V ZIYA S was owned by Northwest Shipping Corporation (hereinafter "Northwest"), a Panamanian entity.

In the shipping industry, when a ship is provided with assorted fuel products and other necessary fluids, such activity is referred to as receiving "bunker" supplies. Oil Shipping (Bunkering) B.V. (hereinafter "Oil Shipping"), a Dutch Company, supplied approximately $270,000 in bunkers to the M/V ZIYA S on three occasions: October 21, 1991 at Gibraltar; February 1, 1992 at Suez, Egypt; and March 3, 1992 at Gibraltar. Oil Shipping filed this suit on March 27, 1992, alleging *in rem* and *in personam* claims against the M/V ZIYA S and her operator, Sonmez, for past due charges in the amount of $270,000.

On the same day as Oil Shipping filed its complaint, the court issued a warrant for arrest ordering the United States Marshals Service to seize the M/V ZIYA S upon arrival in Philadelphia, Pennsylvania pursuant to Rule C of the Supplemental Rules For Certain Admiralty And Maritime Claims. At approximately 11:15 a.m. on March 29, 1992, a United States Marshal arrested and took into custody the M/V ZIYA S at Pier 122 South Wharves, Philadelphia. The Master of the M/V ZIYA S was appointed substitute custodian by the Court. On May 12, 1992, the United States Marshals Service sold the M/V ZIYA S at public auction for 1.82 million dollars, not including the fuel aboard ship; the fuel was sold in a separate transaction to the successful bidder for $130,000. All proceeds from the sale of the ship and fuel have been paid into the Registry of the Court. Pursuant to a Consent Order dated October 23, 1992, plaintiff Oil Shipping and all intervening parties agreed to have the Clerk of the Court disperse funds from the Registry in the amount of $1,469,784.38 to pay certain undisputed *in custodia legis* costs, certain undisputed liens, and $1.35 million to Royal Bank in partial satisfaction of its first preferred mortgage lien against the M/V ZIYA S.

In addition to Oil Shipping, other parties also have claims against the M/V ZIYA S and subsequently these parties have intervened as plaintiffs. The Royal Bank of Scotland (hereinafter "Royal Bank") has a claim against the M/V ZIYA S and Northwest arising from Royal Bank's first mortgage against the M/V ZIYA S. Royal Bank's first mortgage was in exchange for an eleven million dollar loan made on April 28, 1989. When Northwest defaulted on its mortgage payments and on April 2, 1992, Royal Bank filed an Amended Motion to Intervene Pursuant to Federal Rules of Civil Procedure 24, seeking 3.5 million dollars, unpaid interest, and attorney's fees and costs against three parties: Northwest; Sonmez *in personam*; and the M/V ZIYA S *in rem*. Royal Bank's first mortgage on M/V ZIYA S was registered and recorded in Panama. This mortgage constituted a preferred mortgage, a term which shall be explained, *infra*.

International Marine Fuels of San Francisco, Inc. (hereinafter "IMF") also has a claim against the M/V ZIYA S. On March 30, 1992, IMF delivered, via a contractor, 2,185.23 metric tons of fuel oil and 122.18 metric tons of diesel oil to the M/V ZIYA S while she lay at Pier 122 South in Philadelphia. On April 30, 1992, IMF filed a Motion to Intervene and a Complaint against: Northwest; Sonmez *in personam*; and the M/V ZIYA S *in rem*. IMF seeks $200,781.73 in payment for the bunkers supplied to the M/V ZIYA S, as well as interest and attorney's fees. On May 11, 1992, IMF obtained a Writ of Attachment against the bunkers supplied to the M/V ZIYA S on March 30, 1992, causing the fuel aboard ship to be sold in a separate transaction by the Marshals Service at the public auction on May 12.

Baytur Trading S.A. (hereinafter "Baytur") also filed an intervening complaint against Sonmez *in personam* and M/V ZIYA S *in rem* on April 13, 1992. Baytur is a business entity incorporated under the laws of Switzerland and is principally engaged in the sale of marine fuels. Baytur seeks the recovery of $85,525.40 plus interest, costs, and attorney fees for three fuel deliveries to the M/V ZIYA S at Iskenderun, Turkey on August 4, 1991, October 8, 1991, and October 13, 1991.

Following the disbursement of funds from the Registry of the Court under the October 23 Consent Order, the parties presently mak-

ing motions before the Court are owed the following amounts: Royal Bank—$2,371,-188.56 plus attorney's fees, costs, and future interest; IMF—$200,781.73 plus interest and attorney's fees and costs; Baytur—$85,-525.40 plus interest and attorney's fees and costs. As of February 15, 1992, $477,703.04 remains posted with the Registry of the Court.

## II. *Summary Judgment Standard:*

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340–43 (3d Cir.1990); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259, 106 S.Ct. 2505, 2516, 91 L.Ed.2d 202 (1986).

## III. *Discussion.*

The three intervening plaintiffs all seek their respective claim to the remaining proceeds from the judicial sale of the M/V ZIYA S and her fuel. Although only IMF and Baytur use the term "Summary Judgment" in the title of their motion, while Royal Bank entitles its motion as "Final Distribution of ... Proceeds," all three motions necessarily require that this Court render a final decision of law on the rights and priorities of the parties to the funds in the Court Registry. The Court views all three motions as requiring a summary judgment decision and thus will treat the three motions as such.

The first issue that must be decided is what rights each party possesses. Once the Court determines the rights possessed by each party, the respective priorities of the parties can be determined. It is necessary, however, to outline the pertinent parts of the admiralty laws involved in this lawsuit.

▪ The federal district courts have exclusive original jurisdiction over admiralty cases involving "proceedings for the condemnation of property taken as prize." 28 U.S.C. § 1333. Accordingly, this Court has jurisdiction over the arrest and subsequent judicial sale of the M/V ZIYA S. *Id.* - *See also* Supplemental Rules For Certain Admiralty And Maritime Claims Rule C (action *in rem* may be brought to enforce any maritime lien and court may issue warrant for arrest of vessel).

▪ Both IMF and Baytur assert "maritime liens" against the M/V ZIYA S. A maritime lien is a privileged claim on a vessel arising from the provision of necessaries, such as repairs, supplies, or towage, to the vessel upon order of the owner or an authorized person. *See* 46 U.S.C.A. § 31342 (1992); Black's Law Dictionary 969 (6th ed. 1990).[1] Royal Bank asserts a "preferred mortgage" against the M/V ZIYA S. A preferred mortgage includes a mortgage established as security on a foreign vessel "if the mortgage ... was executed under the laws of the foreign country" where the vessel is registered. 46 U.S.C.A. § 31301(6) (1992).[2] A foreign vessel is a vessel of foreign registry or operated under authority of a foreign country. 46 U.S.C.A. §. 30101 (1992).

Under 46 U.S.C.A. § 31326, when a vessel is sold at a judicial sale, all claims against the vessel are terminated and subsequently attach to the proceeds of the sale. 46 U.S.C.A.

1. 46 U.S.C.A. § 31342 states in pertinent part:
   (a) a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
     (1) has a maritime lien on the vessel;
     (2) may bring civil action in rem to enforce the lien....
   46 U.S.C.A. § 31342 (1992).

2. 46 U.S.C.A. § 31301(6) states in pertinent part: "preferred mortgage"—(B) also means in sections 31325 and 31326 of this title, a mortgage,

hypothecation, or similar charge that is established as a security on a foreign vessel if the mortgage, hypothecation, or similar charge was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port of registry of the vessel or at a central office.
46 U.S.C.A. § 31301(6).

§ 31326 (1992). The law further provides for priority determination between the maritime liens and the preferred mortgages which attach to the proceeds. *Id.* Under section 31326, a preferred mortgage lien has priority over all claims against the vessel, except that foreign mortgages are subordinate to a "maritime lien for necessaries provided in the United States." *Id.*[3]

Having identified the pertinent admiralty laws applicable to this lawsuit, the Court will now turn to the respective rights belonging to each of the intervening plaintiffs.

■ For Royal Bank to obtain a preferred mortgage, section 31301(6)(B) requires a mortgage on a foreign vessel and that the mortgage be executed in accordance with the law of the country where the vessel is registered. 46 U.S.C.A. § 31301(6). There is agreement among the parties that the M/V ZIYA S is a foreign vessel. Although there is some disagreement between Baytur and Royal Bank regarding the controlling registration of the M/V ZIYA S, it is clear that the ship was not registered under the laws of the United States and was registered under the laws of Panama or Turkey or both. *See* Motion of Baytur For Partial Summary Judgment at ¶ 7; Answer of Royal Bank to Baytur's Motion For Partial Summary Judgment at ¶ 7. Accordingly, the M/V ZIYA S qualifies as a foreign vessel under section 30101. 46 U.S.C.A. § 30101. Further, it is not disputed by the parties that Royal Bank possesses a mortgage against the M/V ZIYA S. *See, e.g.,* Motion of Baytur For Partial Summary Judgment ¶ 7. Therefore, Royal Bank has a mortgage against a foreign vessel. The remaining issue for Royal Bank's possession of a preferred mortgage lien under section 31301(6)(B) is the execution and registration of Royal Bank's mortgage.

The parties do not dispute that the M/V ZIYA S was owned by Northwest, a Panamanian corporation. *See* Motion of Baytur For Partial Summary Judgment at ¶ 7; Motion of IMF For Summary Judgment at ¶ 2. Royal Bank provided an affidavit of Gisela Alvarez De Porras, a duly licensed Panamanian attorney, stating under oath that Royal Bank's mortgage was duly executed under the laws of Panama and registered in the Public Registry of Panama as of September 28, 1989. *See* Royal Bank's Memorandum of Law In Support Of Its Reply to Baytur's Motion For Partial Summary Judgment, Exhibit C at ¶¶ 1.02, 2.01, 3.01. Upon the Court's review of the record, there does not appear any dispute regarding the veracity of the Porras affidavit. Thus, the Court must decide whether this affidavit satisfies the requirement of section 31301(6) that the mortgage was executed and registered under the laws of Panama "in a public register at the port of registry of the vessel or at a central office." *See* 46 U.S.C.A. § 31301(6).

In *Mobile Marine Sales, Ltd. v. M/V PRO-DROMOS,* 776 F.2d 85 (3d Cir.1985), the Third Circuit decided a case similar to the instant case. In *Mobile Marine,* a Liberian corporation purchased the M/V PRODRO-MOS with a loan from two foreign banks. *Id.* at 86. Both banks registered the mortgage in Panama. *Id.* at 87.[4] The M/V PRO-DROMOS was seized in Philadelphia by four foreign parties asserting various maritime liens for food, supplies, and other necessaries supplied outside the United States. *Id.* The banks intervened to enforce their mortgage rights. *Id.* Following judicial sale of the

3. 46 U.S.C.A. § 31326 states in pertinent part:

(a) When a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien ... the vessel is sold free of all those claims.

(b) Each of the claims terminated under subsection (a) of this section attaches, in the same amount and in accordance with their priorities to the proceeds of the sale, except that—

(1) the preferred mortgage lien has priority over all claims against the vessel (except for expenses and fees allowed by the court, and preferred maritime liens); and

(2) for a foreign vessel, the preferred mortgage lien is subordinate to a maritime lien for necessaries provided in the United States.

46 U.S.C.A. § 31326 (1992).

A "preferred maritime lien" is a maritime lien on a vessel arising before the filing of a preferred mortgage lien. *See* 46 U.S.C.A. § 31301(5) (1992).

4. The banks completed a preliminary registration of the vessel under the Panamanian flag and registered the mortgage through the Consul General of Panama in London. *Mobile Marine,* 776 F.2d at 87.

vessel, the banks sought priority in the proceeds of the sale as holders of a foreign mortgage with preferred status. *Id.* at 88. In opposition, the foreign maritime lienholders asserted that the omission of the navigation license number from the banks's mortgage registrations rendered the registrations fatally defective under Panamanian law and thus the banks should not have priority over the maritime liens. *Id.* The district court held that the mortgages were duly registered and therefore the banks had priority over the maritime liens. *Id.*

On appeal, the Third Circuit affirmed the district court. The Third Circuit noted that the "preliminary and protocolized mortgage registrations and flag registrations are recorded in a single microform fiche at the Public Registry [in Panama]." *Id.* at 87. The *Mobile Marine* court's reasoning relied primarily on Panamanian statutes which provided that the missing navigation license number was not a basis for voiding a mortgage registration. *Id.* at 91, 92. Moreover, the court concluded that the banks's registration "complied sufficiently with the procedural requirements to provide completely adequate notice of the mortgage ... to any third party who inspected the records." *Id.* at 92.

■ This Court finds the Third Circuit's decision in *Mobile Marine* dispositive of Royal Bank's rights. Similar to the banks in *Mobile Marine,* Royal Bank's mortgage comports with Panamanian law. The Porras affidavit contains an explanation of relevant Panamanian law, Article 1515 of the Code of Commerce of the Republic of Panama, which states the requirements for the creation of a valid mortgage security. Royal Bank's Memorandum Of Law in Support Of Its Reply To Baytur's Motion For Summary Judgment, Exhibit C at ¶ 2.01. The affidavit further states that Royal Bank's mortgage complied with Panamanian law and was duly executed and registered, the affiant providing identification of the relevant microform fiche in the Public Registry, similar to *Mobile Marine.* *Id.* at ¶ 3.01.[5]

In applying *Mobile Marine* to the instant case, the Court treats foreign law questions as questions of law that may be resolved by reference to any relevant information. Fed. R.Civ.P. 44.1. Accordingly, in view of the Porras affidavit and the lack of any opposition to its contents by the parties, the Court finds that Royal Bank's mortgage was executed and registered under the laws of Panama and qualifies as a preferred mortgage under section 31301(6).

■ The next party with a claim against the proceeds of the judicial sale is IMF, who argues that it is entitled to payment for fuel oil and diesel oil delivered to the M/V ZIYA S on March 30, 1992 as *in custodia legis* expenses, or in the alternative, that it has a maritime lien for necessaries provided in the United States. *See* IMF's Memorandum In Support Of Its Motion For Summary Judgment at 6, 11.[6] When a vessel is *in custodia legis,* expenses and costs incurred while the vessel is under arrest cannot create a maritime lien. *New York Dock Co. v. Steamship POZNAN,* 274 U.S. 117, 120, 47 S.Ct. 482, 483, 71 L.Ed. 955 (1927); *Kingstate Oil v. M/V GREEN STAR,* 815 F.2d 918, 922 (3d Cir.1987) (en banc) ("A person furnishing goods or services after its arrest (in *custodia legis*) does not acquire a maritime lien against the vessel for the value of the goods or services."). Further, seizure revokes all authority to incur liabilities on behalf of the vessel. *See* 2 Benedict on Admiralty § 48, at 3–86—87 (7th ed. 1992). Utilizing the court's inherent equitable power where "equity and good conscience" require, expenses incurred while *in custodia legis* may be recovered, however, as an "expense of justice" if the services or property furnished upon the au-

---

5. The Court views the requirement for execution of a foreign mortgage in 46 U.S.C.A. § 31301(6) as turning on whether the registration requirements necessary to give an innocent third party notice of claimed rights were followed. *See Mobile Marine,* 776 F.2d at 90. Accordingly, compliance with Panamanian law regarding the execution and registration of ship mortgages provides adequate notice to third parties.

6. It is noted that IMF's motions and memorandums of law refer to 46 U.S.C. § 911 et seq. Despite the fact the § 911 et seq. was repealed by Pub.L. No. 100–710, § 106(b)(2), 102 Stat. 4752 (1988), the Court shall treat IMF's arguments as referring to the current statutes located at 46 U.S.C.A. § 31301 et seq.

thority of the court serves the common benefit of all those parties having an interest in the vessel. *Steamship POZNAN*, 274 U.S. at 120–22, 47 S.Ct. at 483–84; *Kingsgate Oil,* 815 F.2d at 922–23 (citations omitted). Moreover, in order to receive reimbursement for products or services provided to a vessel *in custodia legis,* the products or services must be necessary for the due care and preservation of the ship. 2 Benedict on Admiralty § 48, at 3–86—91 (7th ed. 1992).

▮▮▮▮ The arrest of the M/V ZIYA S on March 29 by the United States Marshals Service constituted official process required by law and thus effected seizure of the vessel, providing actual and constructive notice to the world that the vessel was *in custodia legis.* *See* Supplemental Rules For Certain Admiralty And Maritime Claims Rule C (action *in rem* may be brought to enforce any maritime lien and court may issue warrant for arrest of vessel); IMF's Memorandum Of Law In Support Of Its Motion For Summary Judgment, Attachment 1 (presenting *Manual For United States Marshals,* 1987 AMC 1041, 1052–53 (1986)). In addition, it is acceptable practice for the Court to appoint the Master of a seized vessel as substitute custodian. *See Manual For United States Marshals,* 1987 AMC 1041, 1049 (1986). Therefore, IMF's argument that the arrest of the M/V ZIYA S was only nominal fails and the Court finds that the M/V ZIYA S was *in custodia legis* as of 11:15 a.m. on March 29, 1992. Because IMF's delivery of oil to the M/V ZIYA S occurred on March 30, one day after the arrest of the vessel by the Marshals Service, IMF could not obtain a maritime lien and IMF can only receive payment if the delivery of oil was an "expense of justice."

*Steamship POZNAN,* 274 U.S. 117, 120–21, 47 S.Ct. 482, 484, 71 L.Ed. 955 (1927).

IMF's delivery of oil to the M/V ZIYA S while *in custodia legis* was not necessary to preserve the vessel and does not satisfy the *POZNAN* requirement that the delivery of oil benefit all of the parties with an interest in the vessel. The M/V ZIYA S consumed about 0.8–1.8 tons of fuel oil while berthed at a pier facility, and the vessel consumed approximately 10 tons of fuel oil per day while navigating/maneuvering in a fresh water port such as Philadelphia. Royal Bank's Motion For Final Distribution, Exhibit C at 3 & Appendices B3–4. Diesel oil consumption for the M/V ZIYA S was approximately 1.5 tons per day without cargo operation. *Id.* The M/V ZIYA S contained 433.1 tons of fuel oil and 86.9 tons of diesel oil on March 29, 1992, and 2673.5 tons of fuel oil and 203.4 tons of diesel oil on March 31, 1992, the increase resulting from the IMF delivery. *Id.* at Exhibit D. The delivery of fuel and diesel oil was not necessary to preserve the M/V ZIYA S as the vessel had sufficient fuel to preserve the ship after its seizure on March 29, 1992.[7] In addition, the subsequent sale of the oil for $130,000, although adding to the funds in the Court Registry, does not inure to the benefit of all parties with an interest in the vessel. Rather, IMF's attachment of the fuel, sale of the fuel in a separate transaction, and IMF's claim of superior rights to the proceeds from the sale of the fuel demonstrate that the delivery of the fuel did not inure to the benefit of any parties other than IMF and is not an "expense of justice." *See Kingstate Oil v. M/V GREEN STAR,* 815 F.2d 918, 924 (3d Cir.1987) (cost of unloading ship that benefitted only some parties not "expense of justice" entitled to preferential categorization).[8]

---

7. Assuming that the M/V ZIYA S consumed 1.8 tons of fuel oil per day and that there was 433.1 tons of fuel oils aboard ship as of March 29, 1992, the vessel had sufficient fuel oil for approximately 240 days. Even accounting for movement of the ship while *in custodia legis,* there was sufficient fuel such that the delivery of over 2200 tons of oil was not necessary to preserve the vessel.

8. IMF also argues that the substitute custodian of the M/V ZIYA S had authority to incur *in custodia legis* costs for the delivery of the oil. IMF's Memorandum Of Law In Support Of Its Motion

For Summary Judgment at 8. The Court does not find this argument persuasive because the ability of the substitute custodian to incur administrative expenses is limited to legitimate expenses that benefit all the interested parties and are necessary for the due care and preservation of the vessel. *See Kingstate Oil,* 815 F.2d at 922–23; 2 Benedict on Admiralty § 48, at 3–86–91 (7th ed. 1992). Contrary to IMF's assertion that the court permitted the delivery of the oil, there was no order by the court for the M/V ZIYA S to receive fuel, although the Court notes that court permission is preferable but not required to in-

Finally, ignorance of actual seizure of the vessel will not elevate *in custodia legis* claims to maritime lien status. 2 Benedict on Admiralty § 48, at 3–90–91 (7th ed. 1992); *The COMMACK,* 8 F.2d 151, 153 (S.D.Fla.1925). IMF's claim that the posting of the notice of arrest on the wheelhouse of the vessel that could not be seen at the time of fuel delivery fails because ignorance of the seizure cannot create any rights or maritime lien. *The COMMACK,* 8 F.2d 151, 153 (S.D.Fla.1925). The Court also notes that executory contracts to supply fuel do not create a lien until the fuel is delivered. *See Garcia v. Warner Quinlan,* 9 F.Supp. 1010, 1011 (S.D.N.Y.1934). Thus, a contract for the delivery of fuel to the M/V ZIYA S entered before the arrest of the vessel cannot create a maritime lien for fuel that was delivered under the contract after the arrest. *Id.*

Therefore, IMF's argument that it obtained a maritime lien for necessaries delivered to a foreign vessel in the United States under section 31326(b)(2) fails because a maritime lien is barred once a vessel is *in custodia legis. See New York Dock Co. v. Steamship POZNAN,* 274 U.S. 117, 120, 47 S.Ct. 482, 483, 71 L.Ed. 955 (1927); *Kingstate Oil v. M/V GREEN STAR,* 815 F.2d 918, 922 (3d Cir.1987). Further, IMF's delivery of fuel does not qualify as an "expense of justice" because the delivery did not inure to the common benefit of the parties with an interest in the vessel, nor was it necessary for the preservation of the vessel while under arrest.[9]

The remaining party with a claim to the proceeds in the Court Registry, Baytur, claims that it has a maritime lien arising from its delivery of fuel in Turkey. In light of the record before the Court and the lack of any dispute regarding Baytur's delivery of fuel, the Court finds that Baytur possesses a maritime lien against the M/V ZIYA S as of the date of deliveries in August and October 1991. 46 U.S.C.A. § 31342.

In summary, the Court finds that Royal Bank has a preferred mortgage under section 31301(6), IMF has no right to payment under the doctrine of *in custodia legis,* and Baytur possesses a valid maritime lien under § 31342.

The next issue is the priority between Royal Bank's preferred mortgage and Baytur's maritime lien regarding the funds in the Court Registry. Baytur argues that in deciding the priority issue, the Court is faced with a choice of law issue, and moreover, that the law of Turkey applies to the determination of priorities.[10] Despite Baytur's vigorous argument that the priority contest presents a choice of law issue, the Court finds that as a matter of law, priority contests between maritime liens and preferred mortgages are determined by the law of the forum; in the instant case, the United States. *See Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515, 521 (2d Cir.1979); *Payne v. SS TROPIC BREEZE,* 423 F.2d 236, 238–39 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970); G. Gilmore & C. Black, *The Law of Admiralty* 701 & nn. 262f & 262g (2d ed. 1975).

As Baytur states, "The laws of every maritime nation include rules by which the priority of competing lien and mortgage claims are to be determined." Baytur's Motion For

cur *in custodia legis* costs. *See* IMF's Memorandum In Opposition To Royal Bank's Motion, at 4; *Kingstate Oil,* 815 F.2d at 923 n. 2; *see also* 2 Benedict on Admiralty § 48, at 3–86–87 (7th ed. 1992) (seizure revokes all authority to incur liabilities on behalf of the vessel); *Roy v. M/V KATERI TEK,* 238 F.Supp. 813, 815 (E.D.La. 1965) (claim for fuel and ice entitled to priority over preferred mortgage lien where captain appointed keeper of vessel *in custodia legis* and court order allowed use as charter vessel). Further, IMF's citation of *Roy v. M/V KATERI TEK* is distinguishable from the instant case because in *Roy,* the court expressly allowed the use of the

seized vessel for profit and the accompanying expenses of operating the ship. *Id.* at 815.

9. The Court does not find it necessary to reach IMF's claims for tortious conduct of the vessel and its agents because these claims are negated by the proper seizure of the M/V ZIYA S by the Marshals Service.

10. The Court notes that the laws of the United States and the laws of Turkey provide opposite results on the priority of preferred mortgages, the laws of Turkey favoring Baytur and awarding Baytur priority over Royal Bank. Baytur's Motion For Partial Summary Judgment at 2.

Partial Summary Judgment, at 2. Baytur goes on to argue that the "center of gravity" test established by the Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1952) should be used to determine whose law applies to the determination of priorities. Although Baytur argues persuasively for the application of Turkish law, the Court finds the opinion in *Payne v. SS TROPIC BREEZE*, 423 F.2d 236 (1st Cir.), *cert. denied*, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970) relevant regarding the application of the *Lauritzen* factors to priority determinations:

> In casting their argument on this point in traditional choice-of-law terms, the parties seem to have misapprehended the nature of the question. The Ship Mortgage Act establishes the relative priorities of foreign ship mortgages and other maritime liens. It is axiomatic that Congress has the power "to condition access to our ports by foreign-owned vessels upon submission" to our law, substantive and procedural. *Lauritzen v. Larsen*, 345 U.S. 571, 592, 73 S.Ct. 921, 933, 97 L.Ed. 1254 (1953). The crux of the matter, then, is whether Congress so intended the priority provisions of the Ship Mortgage Act. We conclude that it did.

*Id.* at 238–39. The recent amendment to the admiralty laws do not appear to alter the decision of the *Payne* court. Therefore, the Court finds that a priority contest between a foreign ship mortgage and a maritime lien is governed by the law of the forum and does not raise a choice of law issue.[11]

■ The Court finds that there are no disputes of material facts and the case is ripe for summary judgment. *See Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340–43 (3d Cir.1990); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir.1988). Applying the United States priority law under 46 U.S.C.A. § 31326(b), Royal Bank's preferred mortgage has priority over Baytur's maritime lien because the liens arose in 1991, subsequent to the execution and registration of Royal Bank's mortgage in September 1989. Accordingly, Royal Bank is entitled to all of the remaining funds in the Court Registry, including accrued interest, because Royal Bank is owed an amount greater than that contained in the Court Registry.

An appropriate order follows.

## ORDER

AND NOW, this 5th day of April, 1993, upon consideration of Motion of Plaintiff/Intervenor Royal Bank of Scotland For Final Distribution of M/V Ziya S and Bunker Sale Proceeds, Motion of Plaintiff/Intervenor International Marine Fuels of San Francisco Inc. For Summary Judgment, and Motion of Plaintiff/Intervenor Baytur Trading S.A. For Partial Summary Judgment, and responses thereto, it is hereby ORDERED that Motion of Plaintiff/Intervenor Royal Bank of Scotland For Final Distribution of M/V ZIYA S and Bunker Sale Proceeds is GRANTED.

IT IS FURTHER ORDERED that Motions of Plaintiff/Intervenor International Marine Fuels of San Francisco Inc. For Summary Judgment and the Motion of Plaintiff/Intervenor Baytur Trading S.A. For Partial Summary Judgment are DENIED. It is FURTHER ORDERED that Plaintiff/Intervenor Royal Bank of Scotland shall receive the entirety of the funds remaining in the Court Registry from the judicial sale of the M/V ZIYA S and her bunkers, including accrued interest. It is FURTHER ORDERED that the Clerk of the Court distribute the aforesaid funds to Plaintiff/Intervenor Royal Bank of Scotland.

AND IT IS SO ORDERED.

---

11. The Court also notes the Third Circuit's language in *Mobile Marine*, a case involving a foreign holder of a foreign ship mortgage, that "[h]olders of foreign mortgages are free to enforce any greater rights they might have under foreign law in a foreign forum." *Mobile Marine*, 776 F.2d 85, 89 (3d Cir.1985). Thus, there does not appear to be a bar to Royal Bank seeking priority under United States law, compared to lesser rights available to the bank under Turkish law.