10 F.3d 1015
 1994 A.M.C. 892, 62 USLW 2400
 OIL SHIPPING (BUNKERING) B.V.; Baytur Trading S.A.; The
Royal Bank of Scotland PLC; Tramp Oil Corporation;
Pennsylvania Ship Supply Co., Inc.; International Marine
Fuels of San Francisco, Inc.; Tramp Oil and Marine Limited;
Bridge Oil Limited; Moran Towing of Pennsylvania, Inc.
v.
SONMEZ DENIZCILIK VE TICARET A.S.; M/V ZIYA S, her engines,
boilers, tackle, etc.; Northwest Shipping
Corporation; K. Dan Dalkiran,
Baytur Trading, S.A., Appellant.
 No. 93-1341.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 8, 1993.
Decided Dec. 8, 1993.
 
 Jeffrey S. Moller (argued), Marjorie Singer Ochroch, Clark, Ladner, Fortenbaugh & Young, Philadelphia, PA, for appellant.
 Henry C. Lucas, III (argued), Matthew P. Harrington (argued), Rawle & Henderson, Philadelphia, PA, for appellee The Royal Bank of Scotland plc.
 Present: HUTCHINSON, COWEN and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellant Baytur Trading S.A. ("Baytur") appeals an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment in favor of appellee, The Royal Bank of Scotland plc ("Royal Bank"). In granting the Royal Bank's motion for summary judgment, the district court did not engage in a choice of law analysis but held that the priority of maritime liens and preferred mortgages on a vessel arrested in a United States port is determined by the United States Ship Mortgage Act, 46 U.S.C.A. Secs. 31301-31343 (West Supp.1993, Partial Revision) (the "Ship Mortgage Act" or the "Act"). See Oil Shipping (Bunkering) B.V. v. Royal Bank of Scot. plc, 817 F.Supp. 1254 (E.D.Pa.1993). We will affirm the district court.
 
 
 2
 This maritime action was originally brought by Oil Shipping (Bunkering) B.V. ("Oil Shipping") to obtain payment for certain supplies Oil Shipping provided to the defendant vessel M/V ZIYA S ("ZIYA S"). Baytur intervened to enforce a maritime lien for fuel oil it had delivered to the ZIYA S in Turkey, pursuant to contract. Royal Bank is the holder of a preferred mortgage on the ZIYA S. Under the Ship Mortgage Act, a preferred mortgage is entitled to priority over maritime liens for necessaries. Under Turkish law, however, a maritime lien for necessaries is entitled to priority over a preferred mortgage. In its cross-motion for summary judgment, Baytur contended that standard choice of law principles required application of Turkish law. Royal Bank contended that the Ship Mortgage Act superseded any judge-made choice of law principles and, accordingly, its mortgage was entitled to priority.
 
 
 3
 The district court agreed with Royal Bank, applied the Ship Mortgage Act, and concluded that Royal Bank's lien had priority over Baytur's. Accordingly, it entered summary judgment for Royal Bank. We must decide whether priorities of maritime liens and preferred mortgages on vessels in custody within the territorial jurisdiction of the United States are determined by the Ship Mortgage Act without an analysis under judge-made principles governing conflict of laws. There is a split of authority on this issue among the courts that have considered it. We agree with those which have decided that Congress intended the Ship Mortgage Act to control issues of priority arising in district courts sitting in admiralty. We will, therefore, affirm.
 
 I. Factual & Procedural History
 
 4
 The ZIYA S is a bulk carrier ship which flew the flag of the sovereign state of Turkey. At the time of her seizure, she was nominally owned by Northwest Shipping Corporation ("Northwest"), a Panamanian entity. When this case arose, she was bareboat chartered to Sonmez Denizcilik ve Ticaret A.S. ("Sonmez") and its wholly controlled subsidiary Ziden Denizcilik ve Ticaret ("Ziden"). She is so listed in the Turkish Bareboat registry. Sonmez is a Turkish company with its primary place of business in Istanbul, Turkey. Sonmez, once among the most important ship owners in Turkey, has recently been afflicted by financial problems.
 
 
 5
 On April 28, 1989, to refinance the ZIYA S's acquisition loan, Northwest borrowed eleven million dollars from Royal Bank under a loan agreement executed on the same date. Simultaneously, Northwest executed and delivered a First Preferred Panamanian Ship Mortgage (the "Mortgage") in favor of Royal Bank. The Mortgage was executed and registered in the public registry in Panama. Sonmez, as operator of the ZIYA S, acted as guarantor of the loan from Royal Bank to Northwest.
 
 
 6
 The loan agreement included a clause stating that it was to be governed and construed in accord with English law but that the Mortgage was to be construed under the laws of Panama. Northwest and Sonmez also agreed to submit to the jurisdiction of any court in which Royal Bank, as mortgagee, might choose to bring any legal action concerning the Mortgage.
 
 
 7
 Throughout 1991 and 1992, Sonmez entered into various contracts for supplying to the ZIYA S fuel oil, marine diesel oil, and other services.[1] Among the ship's suppliers were Oil Shipping, a Dutch based company; Baytur, a Swiss based company; and Tramp Oil Corporation/Tramp Oil Marine Ltd. ("Tramp"), a British based company. Oil Shipping delivered bunkers to the ZIYA S at Gibraltar and Suez; Tramp delivered bunkers to the ZIYA S at Kaosiung (Taiwan), Singapore, and Puerto Ordaz, Venezuela; and Baytur delivered bunkers at Iskenderun, Turkey, on August 4, 1991, October 8, 1991, and October 13, 1991. By March 27, 1992, Sonmez owed Oil Shipping approximately $270,000.00; Tramp about $263,450.00; and Baytur $85,525.40. In addition, Northwest and Sonmez had defaulted $3,500,000.00 in payments to Royal Bank exclusive of interest and costs.
 
 
 8
 Around this time the ZIYA S arrived in Philadelphia. There, on March 27, 1992, Oil Shipping precipitated this litigation by filing claims in the district court against the ZIYA S, in rem, and against Sonmez, in personam. In them, it sought recovery of the value of the bunkers it had supplied to the ZIYA S at Gibraltar and Suez. On March 29, 1992, acting under an arrest warrant, the United States Marshals Service arrested the ZIYA S while it was berthed at Pier 122, South Wharves, Philadelphia, Pennsylvania. [Id.] At least one company, International Marine Fuels of San Francisco ("IMF"), provided bunkers subsequent to the ZIYA S's seizure. The status of its lien in the amount of $200,781.73 is the subject of a separate appeal disposed of by our opinion in Oil Shipping (Bunkering) B.V. v. Royal Bank of Scot. PLC, 10 F.3d 176 (3d Cir.1993).
 
 
 9
 On April 2, 1992, Royal Bank intervened in Oil Shipping's action asserting claims under the Ship Mortgage Act against both Sonmez and Northwest, in personam, and against the ZIYA S, in rem, for the $3,500,000.00 plus interest, costs, and fees due it in damages arising out of Sonmez's and Northwest's failure to perform under the loan agreement and mortgage.
 
 
 10
 On April 13, 1992, Baytur intervened, asserting its claim against Sonmez, in personam, and the ZIYA S, in rem, in the amount of $85,525.40 plus interest, costs, and fees for Sonmez's failure to pay for Baytur's bunker deliveries to the ZIYA S in Turkey.[2] On April 30, 1992, IMF also intervened, asserting claims of $200,781.73 plus interest, costs, and fees associated with its bunker delivery on March 30, 1992. On May 11, 1992, IMF obtained a writ of attachment against the bunkers it supplied.
 
 
 11
 On April 15, 1992, the court entered an order directing that the ZIYA S be sold by the United States Marshal at public auction. This sale occurred on May 12, 1992, and netted $1.82 million dollars, exclusive of the bunkers provided by IMF on March 30, 1992, and subject to the aforementioned writ of attachment. The IMF bunkers were sold separately to the ZIYA S's new owner for $130,000.00. By court order, these proceeds were paid into the court's registry, along with the $1.82 million received from the sale of the ZIYA S.
 
 
 12
 On November 12, 1992, under a consent order binding Oil Shipping and all intervening parties, including Baytur and Royal Bank, the clerk of the district court disbursed $1,469,784.38 from the court registry. These funds were used to pay certain undisputed liens for expenses in custodia legis or administrative costs and $1.35 million to Royal Bank in partial satisfaction of the Mortgage. This left a balance of $477,703.04 in the court's registry.
 
 
 13
 On November 12, 1992, just before disbursement of the registry funds under the consent decree, Royal Bank's total outstanding claim against Northwest, Sonmez, and the ZIYA S was $3,721,188.56. It consisted of $3.5 million unpaid principal, $149,153.60 accrued interest, and $72,034.96 miscellaneous mortgage disbursements. After the $1.35 million payment, Royal Bank's claim totalled $2,371,188.56 plus future interest, costs, and fees. At this time, IMF still had an unresolved claim of $200,781.73; Baytur had an unresolved claim of $85,525.40; and Oil Shipping had an unresolved claim of $270,000.00.
 
 
 14
 On November 13, 1992, Royal Bank, IMF, and Baytur filed opposing motions for summary judgment. Oil Shipping did not file any motion, but its complaint in rem against the ZIYA S, and in personam against Sonmez has not been dismissed. On April 6, 1993, the district court filed an opinion and order granting Royal Bank's motion for summary judgment, denying IMF's and Baytur's summary judgment motions, and directing the remaining proceeds be paid to Royal Bank. See Oil Shipping (Bunkering) B.V., 817 F.Supp. at 1262. Baytur filed a timely notice of appeal.
 
 II. Jurisdiction & Standard of Review
 
 15
 The district court had subject matter jurisdiction under 28 U.S.C.A. Sec. 1333(1) (West 1966). Because the district court's order granting summary judgment in favor of Royal Bank is a final order, we have appellate jurisdiction under 28 U.S.C.A. Sec. 1291 (West 1993). We review the district court's grant of summary judgment de novo.
 
 III. Choice of Law Analysis
 
 16
 In its motion for summary judgment, Baytur contended that the court had to engage in a standard choice of law analysis and that such an analysis would demonstrate that Turkish law should apply to the determination of the lien and mortgage priorities among the different parties. Royal Bank, on the other hand, contended that the United States' Ship Mortgage Act supplied the applicable law to determine priorities among the liens and the mortgage that encumbered the ZIYA S. The district court declined to engage in the choice of law analysis Baytur advocated. It concluded that priority among competing maritime liens and preferred mortgages is presumptively determined by the law of the forum. Oil Shipping (Bunkering) B.V., 817 F.Supp. at 1262 ("[A] priority contest between a foreign ship mortgage and a maritime lien is governed by the law of the forum and does not raise the choice of law issue." (footnote omitted)). In reaching this conclusion the district court relied on Gulf Oil Trading Co. v. Creole Supply, 596 F.2d 515, 521 (2d Cir.1979) and Payne v. SS TROPIC BREEZE, 423 F.2d 236 (1st Cir.), cert. denied, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970).
 
 
 17
 Generally speaking, before a choice of law question arises there must be an actual conflict between the two applicable bodies of law. Cf. Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir.1991). In other words, if law A is applied, the outcome will differ from the outcome if law B is applied. The parties agree that under United States law (the Ship Mortgage Act) a mortgage which is deemed a "preferred mortgage" is entitled to priority in the funds generated by a vessel's foreclosure sale.[3] 46 U.S.C.A. Sec. 31326(b). Thus, in the case at hand, if the Ship Mortgage Act supplies the governing law on priority, Royal Bank's Mortgage has priority over Baytur's liens for bunkers provided outside of the United States.[4] Id. On the other hand, the parties seem to agree,[5] that under Turkish law, Baytur, as a maritime lienor of necessaries, would enjoy priority status over the Royal Bank's Mortgage. Thus, this case presents an actual conflict and correspondingly poses a choice of law problem.
 
 
 18
 The United States Supreme Court has indicated that an admiralty court facing a choice between the application of domestic law (United States) or the application of foreign law (i.e. Turkish law) should engage in a form of interest or contact analysis similar to that set out in the Restatement (Second) of Conflict of Laws. See Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).[6] Before engaging in a standard conflict of laws analysis under Restatement principles, however, a court must first determine whether any particular statute preempts Restatement analysis. Lauritzen, 345 U.S. at 579 n. 7, 73 S.Ct. at 926 n. 7 ("Where ... it is clear that the legislature has actually addressed itself to the choice of law problem, the courts, subject to the limitation of constitutionality, must give effect to its intentions." (quoting Cheatham and Reese, Choice of the Applicable Law, 52 Col.L.Rev. 959, 961 (1952))); see also Restatement (Second) on Conflict of Laws Sec. 6(1) (1971) [hereinafter Second Restatement ] ("A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law."). In Lauritzen, the Supreme Court, faced with the question whether the Jones Act provided relief for a Danish seaman for injuries sustained aboard a Danish ship while located within the territorial waters of Cuba, considered first whether the legislative history and policies underlying the Jones Act conclusively evidenced a Congressional intent that the Jones Act apply to foreign citizens injured outside of the United States. Lauritzen, 345 U.S. at 573, 579-81, 73 S.Ct. at 923-24, 926-28. It concluded that the generality of the statutory language and the history of the Jones Act did not make the statute clearly applicable to foreigners acting outside the United States. Id. at 578-81, 73 S.Ct. at 925-28.
 
 
 19
 Here, the district court determined that the Ship Mortgage Act governed priority among the different maritime liens and the preferred mortgage and so declined to engage in further choice of law analysis. See Oil Shipping (Bunkering) B.V., 817 F.Supp. at 1261-62. In reaching its conclusion the district court relied heavily on Payne v. SS TROPIC BREEZE, 423 F.2d 236 (1st Cir.1970). In Payne, the United States Court of Appeals for the First Circuit concluded Congress intended the Ship Mortgage Act to govern priorities between foreign ship mortgages and maritime liens in an action in a United States court. Id. at 239. The Payne case arose in connection with the court ordered sale of the SS TROPIC BREEZE to satisfy various claims for wages and expenses. Id. at 238. National Western Life Insurance Company ("National") intervened as assignee of a mortgage on the TROPIC BREEZE. Id. at 237-38. In an effort to avoid a foreclosure sale, National entered into a stipulation with the various claimants in which it promised to satisfy all claims the court might decide had priority over the mortgage. Id. at 238. When the district court concluded that all of the master's claims were entitled to priority over the mortgage, National appealed. Id.
 
 
 20
 On appeal, the parties raised the choice of law question. The court of appeals concluded that Congress, in enacting the Ship Mortgage Act, had clearly intended to establish the priorities among foreign ship mortgages and other maritime liens litigated in United States courts. Id. at 238-39. After acknowledging that Congress has the power " 'to condition access to our ports by foreign-owned vessels upon submission' to our law," the court held that the Ship Mortgage Act and its history showed a clear Congressional intent that "the Act apply to all foreclosures of foreign ship mortgages in American courts." Id. at 238-39 (quoting Lauritzen, 345 U.S. at 592, 73 S.Ct. at 933) (footnote omitted). The court of appeals also believed that this reading was consistent with maritime law because priorities among maritime liens have been traditionally governed by the law of the forum. Id. at 239. Thus, it concluded that a Lauritzen choice of law analysis was not necessary and that the Ship Mortgage Act applied. Id. See also Gulf Oil Trading Co. v. Creole Supply, 596 F.2d 515, 521 (2d Cir.1979) ("We hold that title to the proceeds of sale as substitution for the vessel is in the hands of the mortgagee free from any maritime liens, since the priority of liens was a matter for determination by the law of the forum--the Bahamas.") (emphasis added) (citing Payne, 423 F.2d at 239 & n. 8; Brandon v. SS DENTON, 302 F.2d 404, 410 (5th Cir.1962));[7] but see Rainbow Line, Inc. v. M/V TEQUILA, 480 F.2d 1024 (2d Cir.1973). In Rainbow Line, the court of appeals engaged in a Lauritzen "center of gravity" contact analysis in determining whether United States or British law should apply to a dispute over maritime liens. It concluded that "virtually all of the points of contact in the transactions giving rise to [the] dispute are with the United States." Rainbow Line, Inc., 480 F.2d at 1027.
 
 
 21
 On the other hand, the United States Court of Appeals for the Ninth Circuit applies Lauritzen choice of law principles to questions of priority among competing maritime liens. In Gulf Trading & Transportation, Co. v. M/V Tento, 694 F.2d 1191 (9th Cir.1982), cert. denied, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983), the court held that choice of law concerning maritime liens depends on the multiple contact or center of gravity analysis the United States Supreme Court used in Lauritzen. Id. at 1194. In M/V Tento, two creditors began in rem actions to enforce liens against the Tento, a Norwegian flag vessel, and the owner argued that the location where the service was provided governed the choice of law issue. Id. at 1192-93.
 
 
 22
 The district court and court of appeals rejected the choice of law analysis the vessel's owner advanced. Id. Instead, the court of appeals adopted a multiple contact analysis, stating that "choice of law questions involving maritime liens are to be resolved by weighing and evaluating the points of contact between the transaction and the sovereign legal systems touched and affected by it." Id. at 1195. After reviewing the various contacts, the court concluded United States law should apply. See also Cardinal Shipping Corp. v. M/S Seisho Maru, 744 F.2d 461, 464 (5th Cir.1984) ("[T]he Restatement (Second) of Conflicts of Law ... provides the proper model for resolving maritime choice-of-law problems.... This Court in deciding whether American law should govern the validity of the lien, followed the analysis of the Second Restatement and evaluate[s] the various points of contact between the transaction and the governments whose competing laws might apply."); Gulf Trading & Transportation Co. v. Vessel HOEGH SHIELD, 658 F.2d 363 (5th Cir. Unit A.1981), cert. denied, 457 U.S. 1119, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982) (utilizing a two tier approach to choice of law determination concerning maritime liens and specifically adopting the approach of the Second Restatement ).[8]
 
 
 23
 The court in HOEGH SHIELD, however, stated that a Second Restatement contacts evaluation is only half of the inquiry because of the statutory directive found in the Ship Mortgage Act. It then examined the history and underlying policies of the statute and concluded that the Ship Mortgage Act evidenced Congress's intent to protect American bunker suppliers and provide "predictability of result and protection of justified expectations in a particular field of law." Id. at 368. The court of appeals concluded, under the more general factors set out in section 6 of the Second Restatement, that the Ship Mortgage Act provided the applicable law. Id. at 368. The court did not, however, conclude that the Act preempted a conflict analysis, but rather that the statute merely figured into the analysis.
 
 
 24
 Faced with this apparent split among the various circuits as to whether the Ship Mortgage Act presumptively applies to actions involving maritime liens rather than the contacts analysis the Restatement (Second) of Conflict of Laws and Lauritzen favor, this Court implicitly endorsed the reasoning used in Payne that the Ship Mortgage Act presumptively applies to the determination of lien priorities in a maritime dispute in federal district court. See Mobile Marine Sales, Ltd. v. M/V PRODROMOS, 776 F.2d 85 (3d Cir.1985). In M/V PRODROMOS, four foreign maritime lien creditors filed suit against the vessel, the M/V PRODROMOS ("PRODROMOS"), asserting a variety of liens for supplies. The PRODROMOS was arrested. Subsequently, several banks intervened in an effort to enforce their mortgage interests in the PRODROMOS. Id. at 86-87. Following their intervention, the banks sought and were granted a court order for the sale of the PRODROMOS. At the public auction, the banks were the only bidders and bought the PRODROMOS for slightly more than two-thirds of its appraised value. Id. at 87-88. Part of the sale price was used to settle the claims of the creditors with liens against the PRODROMOS for services performed in the United States pursuant to the Ship Mortgage Act's provision that these are preferred claims. The banks filed a motion asking the court to hold that they were entitled to the remaining proceeds of the judicial sale because they were holders of a preferred mortgage under the Ship Mortgage Act. Id. at 88. Payment of the sales proceeds to the banks would have precluded the remaining lienors from any satisfaction of their claims. The other maritime lien creditors therefore opposed the banks' motion, arguing that the mortgage was fatally defective and thus did not constitute a preferred mortgage.
 
 
 25
 On appeal, this Court affirmed the district court's conclusion that the mortgages were preferred under the Act. While not specifically addressing the choice of law issue which the parties apparently did not raise, we reviewed the history of the Ship Mortgage Act and stated:
 
 
 26
 Holders of foreign mortgages are free to enforce any greater rights they might have under foreign law in a foreign forum; the intention of the statute is to provide a simplified procedure for enforcing mortgages without destroying substantive rights. H.R.Rep. No. 1662 83d Cong., 2d sess. 3, reprinted in 1954 U.S. Code & Ad. News 2451, 2453. All the Act requires is that the mortgage or similar charge be "duly and validly executed" and "duly registered" under the foreign law.
 
 
 27
 Id. at 89. We also said "[f]oreign remedies need not be exhausted or even pursued before relief is sought in United States courts." Id. at 90 (citing H.R.Rep. No. 1662, 83d Cong., 2d Sess. 3, reprinted in 1954 U.S.C.C.A.N. 2451, 2453). Of course, our assumption in M/V PRODROMOS that the Ship Mortgage Act controls to determine priority among maritime liens on vessels arrested in United States waters is not necessarily binding on the panel, but we are persuaded that Congress did indeed intend our district courts to apply the Act to disputes over the priority of maritime liens on vessels in our waters.
 
 
 28
 Royal Bank argues that the language and legislative history of the Ship Mortgage Act provide further support for a holding that the Act was intended to supersede the need for a choice of law analysis. Specifically, Royal Bank relies on the 1954 amendment to the Ship Mortgage Act. It extended the Act's provisions to foreign flag vessels. We agree with Royal Bank's contention that the history of the Act shows that Congress intended it to apply to all controversies over maritime liens brought in United States courts. Our rationale for that conclusion appears from the following overview of the Act's history and purpose.
 
 
 29
 The Ship Mortgage Act, originally enacted in 1920, provides that certain mortgages were "preferred mortgages" and were to be treated as maritime liens. The Ship Mortgage Act of 1920, ch. 250, 41 Stat. 1000 (1920) (current version as amended at 46 U.S.C.A. Secs. 31301-31343 (West Supp.1993, Partial Revision)). Before that time, all ship mortgages were treated as nonmaritime liens that did not fall within the admiralty jurisdiction of the district courts. See H.R.Rep. No. 1662, 83d Cong., 2d Sess., reprinted in 1954 U.S.C.C.A.N. at 2451. Under the 1920 version of the Act, a mortgage on an American flag ship was treated as a maritime lien if both the mortgagee and mortgagor were American citizens and, in that case, the mortgagee could foreclose the mortgage in an admiralty court. Id. Mortgages on foreign flag ships, however, did not fall within the admiralty court's jurisdiction. In 1954, the Ship Mortgage Act was amended to place duly executed mortgages on foreign vessels on the same footing as domestic mortgages. Act of June 29, 1954, ch. 419, 68 Stat. 323 (1954) (current version as amended at 46 U.S.C.A. Secs. 31301-31343). The legislative history of the 1954 amendment demonstrates that Congress wanted to give certain foreign mortgages the same status as domestic mortgages in foreclosure proceedings in the United States. This history refers to a substantial interest the United States has in providing "an expeditious procedure by which a United States court sitting in admiralty may foreclose a ship mortgage on a foreign-flag vessel and give title good against the world to the new purchaser." H.R.Rep. No. 1662, 83d Cong., 2d Sess., reprinted in 1954 U.S.C.C.A.N. at 2452. This same legislative history states: "The procedure would provide a satisfactory forum for attachment and foreclosure when any ... vessel covered by a mortgage in default enters a port of the United States." Id. (emphasis added). It goes on to say:
 
 
 30
 The bill does not prejudice or destroy the substantive rights of an American mortgagee of a foreign-flag vessel. Such mortgagee can foreclose in a foreign court which acts independently of the Ship Mortgage Act, 1920, and secure the higher priority, if any, given the mortgage by the law of the foreign country. On the other hand, if the ... mortgagee wishes to foreclose in admiralty in the United States courts, he could do so under the bill and get the benefits of the simplified procedure not available to him under the existing law.
 
 
 31
 Id., reprinted in 1954 U.S.C.C.A.N. at 2453. Finally, the purpose of the amendment is specifically identified as the provision of "a suitable remedy in the courts of the United States for the enforcement of ship mortgages on foreign-flag vessels." Id., reprinted in 1954 U.S.C.C.A.N. at 2451.
 
 
 32
 More recently, Congress revised and recodified the Ship Mortgage Act in 1988. Act of November 23, 1988, Pub.L. No. 100-710, 102 Stat. 4735 (codified as amended at 46 U.S.C.A. Secs. 31301-31343). The legislative history of this revision states that Sec. 31326, the Act's provision governing enforcement and priority of maritime liens and preferred mortgages, "makes the process for the enforcement of a maritime lien the same as for the enforcement of a preferred mortgage lien." H.R.Rep. No. 100-918, 100th Cong., 2d Sess. 21, reprinted in 1988 U.S.C.C.A.N. 6104, 6114. The House Report states:
 
 
 33
 When a vessel is sold by order of a district court in a civil action in rem, all claims against the vessel on the date of sale are terminated and, when sold, the vessel is sold free of all those claims. However, with the receipts of the sale, each of the claims terminated will receive the same priority to the proceeds of the sale, with the preferred mortgage having the first priority after expenses and fees allowed by the court....
 
 
 34
 Id. We think all this adequately shows that Congress viewed the Ship Mortgage Act as the law governing priorities of maritime liens and mortgages in an action before a district court.
 
 
 35
 Of controlling importance, however, is the language of the statute itself. That too is in accord with our holding that Congress intended the Ship Mortgage Act to govern priorities among maritime liens in United States courts. It expressly applies to both domestic and foreign mortgage and lien transactions. See, e.g., 46 U.S.C.A. Sec. 31325(b) ("On default of any term of the preferred mortgage, the mortgage[e] may--(1) enforce the preferred mortgage lien in a civil action in rem for a documented vessel, a vessel to be documented ... or a foreign vessel...." (footnote omitted)). Thus, the terms of the Act themselves evidence Congress's intent that it should control all questions of priority among liens that may come before district courts sitting in admiralty. If a federal district court were required to engage in a conflicts analysis that could yield to foreign law, Congress's intent to legislate on lien and mortgage priority in American courts would be frustrated.[9]
 
 
 36
 Indeed, the Ship Mortgage Act specifically speaks to a limited role for foreign law by making the preferred status of foreign mortgages dependent only on their compliance with the execution and registration requirements of the applicable foreign law. See 46 U.S.C.A. Sec. 31301(6)(B) (" '[P]referred mortgage'-- ... means ... a mortgage ... that is established as a security on a foreign vessel if the mortgage ... was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in the public register...."). To require any further choice or conflicts of law analysis in light of the limited express reference to the role of foreign law in the determination of maritime mortgages and liens and priority among them seems to us inconsistent with the intent of the Ship Mortgage Act as evidenced by its language and history.
 
 
 37
 Thus, we conclude that the language and legislative history of the Ship Mortgage Act supports the district court's conclusion that the Ship Mortgage Act presumptively applies to determine questions of priorities between maritime liens and ship mortgages in United States courts. That holding is also supported by the practicalities of the situation. To require a district court to perform a choice of law analysis each time it has an action to foreclose liens on a vessel would result in serious uncertainty about the potential outcome of such a foreclosure action and judicial inefficiency. Cruz, 932 F.2d at 237 (Alito, J., dissenting) (congressional intent found in Fair Labor Standards Act to provide minimum wage protection to seamen on American vessels would be frustrated by Lauritzen balancing test). The adoption of a bright line rule, presumptively applying the Ship Mortgage Act to questions of priority between maritime lien and mortgage holders, provides an important degree of certainty about the relative rights of lien holders on vessels that become subject to a foreclosure process in United States courts when they enter United States waters. It gives a reasonable degree of predictability concerning the answer to questions interested parties may have about the legal status of their claims and liens against vessels that are likely to use United States ports. See also Cruz, 932 F.2d at 237 n. 4 (Alito, J., dissenting) (result of Lauritzen inquiry "nearly as difficult as possible" to predict). For these reasons, we will affirm the district court's holding that the Ship Mortgage Act presumptively governs the relative priorities of the liens asserted by Royal Bank and Baytur.
 
 
 
 [1]
 The provision of these types of supplies is known in the shipping industry as the delivery of "bunker" supplies, and the supplies themselves are referred to as "bunkers."
 
 
 [2]
 Baytur alleged that the claim fell under Sec. 13132 of the Act. There is no such section. We think Baytur meant to file suit under 46 U.S.C.A. Sec. 31342, which governs maritime liens, and we will so assume
 
 
 [3]
 Section 31326 of the Ship Mortgage Act provides:
 (a) When a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated....
 (b) Each of the claims terminated under subsection (a) of this section attaches, in the same amount and in accordance with their priorities to the proceeds of the sale, except that--
 (1) the preferred mortgage lien has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens); and
 (2) for a foreign vessel, the preferred mortgage lien is subordinate to a maritime lien for necessaries provided in the United States.
 46 U.S.C.A. Sec. 31326 (West Supp. Partial Revision 1993).
 
 
 [4]
 The district court concluded that Royal Bank's Mortgage qualified as a preferred mortgage. Under Sec. 31301(6)(B) a mortgage on a foreign vessel is a "preferred mortgage" so long as it is validly "executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port of registry of the vessel or at a central office." 46 U.S.C.A. Sec. 31301(6)(B). The key to a preferred mortgage is its due execution and registration under the laws of the country in which the vessel's ownership is registered. See Mobile Marine Sales, Ltd. v. M/V PRODROMOS, 776 F.2d 85, 89 (3d Cir.1985)
 
 
 [5]
 Royal Bank raises two issues as to whether the application of Turkish law really changes the outcome in this case. It first contends that if Turkish law applies, the district court must apply the "whole" of Turkish law, including Turkish choice of law principles. Royal Bank then asserts that Turkish choice of law principles require the district court to apply United States law because Turkish law designates the lex rei sitae (the law of the place where the vessel is arrested) as the applicable law on in rem claims. In other words, Royal Bank relies on the doctrine of renvoi
 Royal Bank further asserts that at least part of Baytur's claims would be time barred under Turkish law. Because we conclude that the Ship Mortgage Act is the applicable law, we do not address either of these two contentions.
 
 
 [6]
 In Lauritzen, the Supreme Court identified seven factors to be considered in determining what law to apply to a maritime tort claim. These seven factors were: the place of the wrongful act; the law of the flag; the allegiance or domicile of the injured party; the allegiance or domicile of the defendant shipowner; the place of the contract; the inaccessibility of a foreign forum; and the law of the foreign forum. Lauritzen, 345 U.S. at 583-92, 73 S.Ct. at 928-33. The Supreme Court placed a great deal of emphasis on the law of the flag, stating that it represented "perhaps the most venerable and universal rule of maritime law." Id. at 584, 73 S.Ct. at 929. Other factors entitled to great weight were the domicile of the ship owner and the domicile of the injured party. Id. In Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court revisited the Jones Act and reaffirmed the choice of law analysis promulgated in Lauritzen but noted that the seven identified factors were not intended to be exhaustive. Id. at 309, 90 S.Ct. at 1734
 
 
 [7]
 Although the result in Creole Supply is in accord with that reached by the district court in the case at bar, Creole Supply relied on Payne for a somewhat different proposition. Creole Supply cites specifically to the Payne articulation of the traditional law of maritime liens being governed by the law of the forum rather than the identification of a congressional intent to subject foreign lienholders to American law, the proposition for which the district court turned to Payne
 
 
 [8]
 Section 6 of the Second Restatement provides:
 (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
 (2) When there is no such directive, the factors relevant to the choice of applicable rule of law include
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.
 Restatement (Second) Conflict of Laws Sec. 6 (1971).
 
 
 [9]
 In Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218 (3d Cir.1991), we affirmed a district court's holding that the Fair Labor Standards Act did not apply to Kuwaiti vessels that had been put under our flag in order to assure their protection from attack in the Persian Gulf during the war between Iran and Iraq in the 1980's which did not produce an Opinion of the Court. Id. at 220. Judge Rosenn, in an Opinion Announcing the Judgment of the Court, concluded that the applicability of the Fair Labor Standards Act to that dispute involving the wages of Filipino seamen manning those vessels was a matter of statutory interpretation, not choice of law. Id. at 224-25. Judge Alito concurred in that view but dissented from the Court's mandate affirming the district court's refusal to apply the Fair Labor Standards Act because he disagreed with Judge Rosenn's conclusion that the vessels were not in commerce, a prerequisite to application of the Fair Labor Standards Act to the dispute. Id. at 235. Judge Cowen, after concluding that the Fair Labor Standards Act was not meant to apply to the situation before the Court, went on to apply a Lauritzen analysis and concurred in the result Judge Rosenn had reached. Thus, the Cruz panel concluded, as we do here, that the first question in deciding whether a statute of the United States applies to an admiralty case heard in a United States court is a question of statutory interpretation, not choice of law. In the case before us, the panel unanimously believes that Congress intended the Ship Mortgage Act to apply in determining lien priority to the exclusion of standard choice of laws analysis